307

Submitted on remand from the Oregon Supreme Court August 15, 2011; resubmitted en banc October 3, reversed and remanded with instructions to reinstate the jury's award of punitive damages December 19, 2012

LITHIA MEDFORD LM, INC.,
an Oregon corporation,
dba Lithia Toyota, Lincoln, Mercury, Suzuki,
*Plaintiff-Respondent,*

*v.*

Shawn S. YOVAN,
aka Stefan Shawn Yovan,
*Defendant-Appellant.*

Shawn S. YOVAN,
aka Stefan Shawn Yovan,
*Counterclaim Plaintiff,*

*v.*

LITHIA MEDFORD LM, INC.,
an Oregon corporation,
dba Lithia Toyota, Lincoln, Mercury, Suzuki,
*Counterclaim Defendant.*

Jackson County Circuit Court
010895L1; A128045

295 P3d 642

G. Jefferson Campbell, Jr., and G. Jefferson Campbell, Jr., P.C., for appellant.

Matthew Sutton for respondent.

Before Haselton, Chief Judge, and Armstrong, Wollheim, Schuman, Ortega, Sercombe, Duncan, Nakamoto, and Hadlock, Judges.

NAKAMOTO, J.

## NAKAMOTO, J.

Defendant and counterclaim plaintiff Shawn Yovan (defendant) prevailed on his claim under the Oregon Unlawful Debt Collection Practices Act (the Act), ORS 646.639 to 646.641, against plaintiff and counterclaim defendant Lithia Medford LM, Inc. (plaintiff). The jury awarded defendant $500 for his noneconomic damages and $100,000 in punitive damages. The trial court concluded that the punitive damage award was unconstitutional under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and reduced punitive damages to $2,000. Defendant appealed, and the trial court's judgment was affirmed by an equally divided court, *Lithia Motors, Inc. v. Yovan*, 226 Or App 572, 204 P3d 120 (2009) (*Lithia Motors I*), *vac'd and rem'd*, 349 Or 663, 249 P3d 1281 (2011). The case is before us again, on remand from the Supreme Court, for our reconsideration in light of *Hamlin v. Hampton Lumber Mills, Inc.*, 349 Or 526, 246 P3d 1121 (2011) (*Hamlin II*). The sole issue on appeal is the propriety of the jury's award of punitive damages against plaintiff. We have reexamined the facts and our analysis given the considerations in *Hamlin II* and conclude that the jury's verdict in this small-damage case was neither grossly excessive nor unconstitutional. Accordingly, we reverse and remand with instructions to enter judgment in accordance with the jury's verdict.

### FACTS

The relevant facts are those supporting the Jackson County jury's verdict on defendant's third counterclaim under the Act. In that counterclaim, defendant alleged that plaintiff and its agents and employees violated the Act by "threatening arrest or criminal prosecution of [defendant], in violation of ORS 646.639(2)(b)" and by "attempting to or threatening to enforce a right or remedy with knowledge or reason to know that the right or remedy did not exist, in violation of ORS 646.639(2)(k)." Defendant also alleged entitlement to punitive damages. This court recounts the facts consistently with the jury's verdict in favor of defendant, including resolving all factual disputes and drawing inferences in favor of the verdict, both as to liability

and punitive damages. *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 556-57, 17 P3d 473 (2001).

In 2000, defendant purchased a used Toyota 4Runner from plaintiff, which owned and operated a Toyota dealership in Medford, for close to $14,000. Five days later, the retail installment sales contract was purchased by a finance company, TranSouth Financial Corporation (TranSouth). Defendant then discovered a report showing that the car's actual mileage was some 25,500 more than what appeared on the odometer at purchase (98,000 miles).

After bringing the mileage discrepancy to the attention of plaintiff, which had not known of the discrepancy, defendant and plaintiff were unsuccessful in reaching a resolution regarding the reduced value of the car. Plaintiff demanded that defendant either pay the balance on the car, less $1,000, or return the car in exchange for his trade-in and deposit. Defendant demanded that plaintiff provide him with a used 4Runner of the type that he thought he had purchased in Medford, and defendant identified such a car for sale at a Lithia dealership in Colorado, but plaintiff refused to settle on that basis. Defendant decided to keep the car and told plaintiff that he would pursue his legal remedies.

Plaintiff's manager insisted on obtaining defendant's car and attempted to intimidate defendant into giving it up. Plaintiff's manager became aggressive and threatened defendant with criminal prosecution for "Grand Theft Auto" if he did not return the car. Next, plaintiff's managers lied to the collection manager of plaintiff's parent company when they told him to have defendant's car repossessed for nonpayment, even though they knew that plaintiff had assigned the installment contract for defendant's purchase of the car to TranSouth and that plaintiff had no legal right to seek repossession of the 4Runner. When the repossession agent tried to take away the car, defendant informed the agent that his first payment was not yet due and the installment contract was not even held by plaintiff. Nevertheless, plaintiff's repossession agent told defendant that he would call the police and that defendant was obstructing justice. After that encounter, defendant placed the car in storage for three months.

Thereafter, plaintiff repurchased the installment contract from TranSouth, and the dealership again offered to lower the purchase price by $1,000, via the amount to be financed, plus offered to provide a $500 cash payment as incentive for an agreement. When defendant rejected the dealership's offer, plaintiff brought an action against defendant for rescission of the sales contract based on mutual mistake.

After repurchasing the retail installment contract from TranSouth, plaintiff misrepresented to defendant and his attorney that defendant no longer had a valid purchase contract. First, plaintiff faxed a page from the sales contract to defendant's counsel that included the following provision:

"In consideration of Seller agreeing to deliver the vehicle, Buyer agrees that if Seller is unable to assign the retail installment contract/lease agreement to any one of the financial institutions with whom Seller regularly does business pursuant to terms of assignment acceptable to Seller, Seller may to rescind the retail installment contract/lease agreement. In the event Seller to rescind the retail installment contract/lease agreement, I will return the vehicle immediately upon their request."

Plaintiff then sent a letter to defendant's counsel indicating, falsely, that TranSouth had rescinded the retail installment contract. Plaintiff told defendant that it was willing to enter into a new retail installment contract and then, as noted above, offered to reduce the purchase price of the car by $1,000 and, if defendant agreed to settle the matter by January 25, 2001, offered defendant an additional $500 to compensate him for "his perceived inconvenience." In fact, TranSouth had not rescinded the contract; plaintiff had repurchased the still-valid contract that plaintiff later sought to rescind in this case.

The jury heard evidence that plaintiff was acting selfishly and maliciously to further its own economic interests as it tried to intimidate or deceive defendant into relinquishing the car. The retail installment contract that plaintiff sold to TranSouth in this case and in other car sales was on a nonrecourse basis, meaning that, if the customer defaulted on loan payments, TranSouth could not go beyond

the collateral to recover the balance owed. But, if there had been a misrepresentation as to the collateral for the loan, TranSouth could require plaintiff to repurchase the contract and thereby bear the risk of nonpayment on the under-secured loan. The credit application that plaintiff submitted to TranSouth showed that defendant earned more than he actually did, listed accessories that the car did not in fact have, and stated a lower mileage figure than the 125,000 miles the car apparently actually had, due to an odometer rollback. TranSouth's branch manager testified that plaintiff repurchased the contract because of the problem with the actual value of the collateral. The jury could have concluded that plaintiff, having been caught after misrepresenting the value of the 4Runner, intimidated defendant to get it back so that it could recover the full amount it had paid for the car from the seller in Idaho, rather than having to risk a loss on the car as a result of the sale to defendant.

The jury also understood that defendant had limited financial resources and limited ability to obtain financing to buy a car. Approximately a year before defendant purchased the car from plaintiff, he had graduated from the Oregon Institute of Technology and obtained a new job in Yreka, California. Defendant's job required him to commute approximately 100 miles to work daily, and so he had to spend $350 a month on gas for his car. He was married with four children, and his annual income from his job in California was approximately $34,000. He purchased the Toyota 4Runner because he wanted a second car that would provide reliable transportation for his family while he was away at work. Around the time when defendant was purchasing the 4Runner, he and his wife were not making installment payments on their house. Some time after the incidents with plaintiff, defendant lost his job and later lost the residence through a foreclosure.

Moreover, plaintiff knew that defendant was financially vulnerable. Plaintiff's practice was to have the salesperson fill out the customer credit application and to obtain a credit report on the customer. Plaintiff knew the amount of money defendant earned because defendant had disclosed that information to plaintiff for the credit

application and had provided a pay stub. Plaintiff then submitted the credit application to TranSouth to seek financing for defendant's car purchase. TranSouth is a "non-prime lender." The financing defendant obtained was, in the words of TranSouth's branch manager, a "sub, sub-prime" loan. The interest rate defendant had to pay on that loan was 21.5 percent. Plaintiff also received the documentation from TranSouth approving the loan to defendant. Plaintiff therefore knew, at the very least from the exorbitant interest rate, if not from a credit report on defendant, that defendant qualified only for a very low-end kind of loan.

Defendant also provided the jury with evidence concerning the level of deterrence required and plaintiff's ability to pay punitive damages. That evidence, though, was limited, given plaintiff's dissolution several months before trial. In December 2003, defendant moved to add Lithia Motors, Inc., as a party plaintiff.[1] In response to defendant's motion, plaintiff stated that it was "a solvent ongoing business and there [was] no danger that it [would] not be able to pay any liability on the counterclaim. * * * Defendant can be awarded complete relief against Plaintiff on the counterclaim." Several weeks later, in early 2004, plaintiff was dissolved and moved to have Lithia MTLM, Inc., a new successor Toyota dealership, substituted as plaintiff. The trial court denied both parties' motions, partly because plaintiff had represented in December that defendant could be awarded complete relief on his counterclaim and because the court believed a change in the parties would delay trial.

Defendant submitted to the jury, among other things, plaintiff's balance sheets from 2001 and 2002, which indicated that plaintiff's total assets ranged from approximately $2.5 million to $3 million during that time period. In addition, the parties submitted the following stipulation to the jury:

> "Plaintiff in this case Lithia Medford LM, Inc., which operated the Toyota Lincoln Mercury Suzuki dealership entered into an assignment and indemnification agreement

---

[1] In 2001, Lithia Motors, Inc., plaintiff's parent company, brought the action against defendant, but it later amended its complaint so that the action was brought by plaintiff instead, because plaintiff was the actual entity that had contracted with defendant.

on May 31st, 2004 with Lithia MTLM Inc. which operates the Lithia Toyota dealership at the new lot \*\*\*. Under that agreement, Lithia MTLM Inc.—the new Lithia dealership lot has agreed to pay all damages you may assess against Lithia Medford LM Inc. in this case. \*\*\* It [has] further been stipulated that Lithia MTLM Inc. the new Lithia Toyota dealership has sufficient assets to fully pay all of the claims for damages of [defendant] including the punitive damages claims of 100,000 dollars on the Unlawful Debt Collection Practices Act and 250,000 dollars on his claim for punitive damages under Unlawful Trade Practices Act."

Thus, the jury understood from the stipulation that plaintiff—through the successor Toyota dealership—had sufficient income or assets to pay a total of approximately $535,000 in claimed damages that could be awarded in a judgment against plaintiff, including up to $100,000 in punitive damages on the counterclaim under the Act on which defendant prevailed.

## THE VERDICT AND MOTION FOR REMITTITUR

The jury returned a special verdict in favor of defendant on the counterclaim and awarded him $500 in noneconomic damages. The jury further found that defendant is "entitled to punitive damages against Plaintiff[.]" Accordingly, the jurors found, as they were instructed, that defendant proved "by clear and convincing evidence" either that (1) plaintiff had shown "a reckless and outrageous indifference to a highly unreasonable risk of harm" and had acted "with a conscious indifference to the health, safety, and welfare of others," or (2) plaintiff had "acted with malice," *i.e.*, had engaged in a wrongful act "intentionally, without just cause or excuse," or had acted with "intentional disregard of the interest of another."

To assess the amount of punitive damages to award against plaintiff, the jury was instructed, without objection, to consider the following items:

"(1)   The character of the Plaintiff's conduct;

"(2)   The Plaintiff's motive;

"(3) The sum of money that would be required to discourage the Plaintiff and others from engaging in such conduct in the future; and,

"(4) The income and assets of the Plaintiff."

The jury determined that $100,000 was the proper amount of punitive damages. The ratio between the punitive damages and the noneconomic damages awarded was 200 to 1.

After the verdict, plaintiff filed a motion for remittitur to reduce the amount of the punitive damages award or, alternatively, for a new trial. Plaintiff contended that the punitive damages award was disproportionate and violated the Due Process Clause of the Fourteenth Amendment.

Citing *BMW of North America, Inc. v. Gore*, 517 US 559, 575, 116 S Ct 1589, 134 L Ed 2d 809 (1996) (*Gore*), *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 US 408, 123 S Ct 1513, 155 L Ed 2d 585 (2003) (*Campbell*), *Bocci v. Key Pharmaceuticals, Inc.*, 189 Or App 349, 76 P3d 669, *modified on recons*, 190 Or App 407, 79 P3d 908 (2003), and *Waddill v. Anchor Hocking, Inc.*, 190 Or App 172, 78 P3d 570 (2003), plaintiff argued that the amount of punitive damages the jury awarded was unconstitutional under the three "guideposts" announced in *Gore*. In examining those guideposts, plaintiff argued that a 200-to-1 ratio between the punitive damages award and actual harm inflicted on defendant was impermissible under the facts of the case and, based on *Campbell* and *Waddill*, there were no facts that would support an award in excess of a 4-to-1 ratio; the degree of reprehensibility of plaintiff's conduct was low; and there was an extreme difference between the amount of punitive damages awarded by the jury and the amount imposed in civil and criminal cases for comparable misconduct.

Defendant opposed the motion, arguing that, as in *Parrott*, the jury's award of $100,000 in punitive damages was within the range of damages that a "rational juror" could award to punish and deter plaintiff, and others, from committing the unlawful debt collection practices inflicted upon defendant. In *Parrott*, a case concerning violations of the Unlawful Trade Practices Act (UTPA), ORS 646.605 to 646.652, the Supreme Court affirmed a $1,000,000 award

of punitive damages and a compensatory award of $11,496, despite the more than 86-to-1 ratio between punitive and compensatory damages. 331 Or at 565. Defendant contended that the Act, another consumer protection statute like the UTPA, expressly provided for punitive damages when a person is injured as a result of a party's willful use or employment of an unlawful collection practice, as he proved to the jury. Defendant further argued that the amount of punitive damages was an appropriate deterrent for the intentional harm plaintiff inflicted and that plaintiff's actions involved trickery or deceit and were motivated by greed. And, unlike the nature of the *Gore* case, defendant noted that his case was not a mere economic damage case because he had proved that he suffered noneconomic damages. Defendant argued that the trial court should conclude, as the Supreme Court did with regard to the conduct at issue in *Parrott*, 331 Or at 562, that plaintiff's conduct "was 'highly reprehensible' based upon the jury's verdict and award."

The trial court agreed with plaintiff. It described plaintiff's actions in its order on post-trial motions as "at worst deceitful and threatening" and "not actions which showed a 'wanton disregard for the health and safety of others.'" The court ruled that, based on *Gore* and *Waddill*, the maximum amount of punitive damages that could be constitutionally awarded was $2,000. The court entered a general judgment in favor of defendant for $500 in noneconomic damages and $2,000 in punitive damages on his counterclaim under the Act.

### *LITHIA I* VACATED AND REMANDED

Defendant appealed. The trial court's judgment was affirmed by an equally divided court, with five judges concurring in the result. *Lithia Motors I*, 226 Or App at 573. The concurrence concluded that the jury's award of $100,000 was grossly excessive and that the trial court did not err in reducing defendant's punitive damages award to $2,000. 226 Or App at 585 (Edmonds, J., concurring). Quoting from our opinion in *Hamlin v. Hampton Lumber Mills, Inc.*, 222 Or App 230, 238-39, 193 P3d 46 (2008) (*Hamlin I*), *rev'd*, 349 Or 526, 246 P3d 1121 (2011), before it was reversed, the concurrence explained that, in reviewing a punitive damages

award, "'we apply constitutionally prescribed guideposts to those predicate facts to determine, if as a matter of law, the award is grossly excessive.'" *Lithia Motors I*, 226 Or App at 580 (Edmonds, J., concurring) (some internal quotations marks omitted). Those constitutional guideposts, originally identified in 1996 in *Gore*, are

"(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."

*Lithia Motors I*, 226 Or App at 581 (Edmonds, Jr., concurring) (internal quotation marks omitted).

In deciding whether the jury's award was unconstitutionally excessive, the concurrence relied on the first two guideposts (reprehensibility and the ratio between punitive and compensatory damages awards), concluding that the third guidepost (civil penalties in comparable cases) "neither militates against nor supports a more substantial punitive damage award." *Id.* at 581-84 (Edmonds, J., concurring). In assessing the reprehensibility of plaintiff's conduct, the concurrence reasoned that, because plaintiff's "most egregious actions were its threat to commence criminal prosecution against defendant because of his failure to voluntarily return the car and its attempt to repossess the car from defendant" and because "defendant was not a particularly vulnerable target of plaintiff's actions[,]" the degree of reprehensibility was "at the lower end of the scale." *Id.* at 581-82 (Edmonds, J., concurring). Under the second guidepost—disparity between the harm and the punitive damages award—the concurrence explained that the

"ratio between the punitive damages awarded and the potential harm suffered by defendant as the result of plaintiff's actions * * * is 200 to 1, far exceeding the four-to-one ratio established as the general ceiling for punitive damages where the only harm is financial and the putative single-digit limit for punitive damages involving personal injury."

*Id.* at 582 (Edmonds, J., concurring). Thus, based on two of three guideposts described in *Gore*, the concurrence

concluded that the jury's punitive damages award of $100,000 was grossly excessive. *Id.* at 584 (Edmonds, J., concurring).

Consequently, the concurrence determined the maximum amount that defendant could recover to comport with due process, using those same guideposts. *Id.* (Edmonds, J., concurring). In reconsidering the guideposts, the concurrence again noted that the degree of reprehensibility of plaintiff's conduct, "while significant, [was] not egregious" and that "the emotional damage to defendant caused by plaintiff [was] relatively minimal[.]" *Id.* at 585 (Edmonds, J., concurring). The concurrence concluded that "any amount in excess of a four-to-one ratio would constitute a grossly excessive award that would serve no legitimate purpose and if upheld, would constitute an arbitrary deprivation of plaintiff's property." *Id.* (Edmonds, J., concurring).

In his dissent, however, Judge Armstrong, along with two other judges, concluded that an award of $25,000 in punitive damages could not offend due process. *Id.* at 592 (Armstrong, J., dissenting). Examining the third guidepost, Judge Armstrong compared civil sanctions authorized in comparable cases. He noted that statutes prohibiting unlawful debt collection practices are comparable to statutes prohibiting unlawful trade practices, and that the state was entitled "to recover civil penalties up to $25,000 for each trade practice violation." *Id.* at 591 (Armstrong, J., dissenting); *see* ORS 646.642(3). He further reasoned that "[t]he legislature's decision to establish such a penalty effectively means that, although punitive damage awards greater than $25,000 on unlawful trade practice claims may be permitted without violating due process, an award of $25,000 on such a claim cannot violate due process." *Id.* at 591-92 (Armstrong, J., dissenting). In a second dissenting opinion joined by one other judge, Judge Sercombe concluded that based on Oregon Supreme Court precedent, we were obliged to limit the jury's punitive damages award so that the ratio between the punitive and the noneconomic damages was a single digit, in this case, $4,500. *Id.* at 596-98 (Sercombe, J., dissenting).

Defendant then successfully petitioned the Supreme Court for review of our decision. The court allowed the petition and vacated and remanded with instructions for us to

reconsider our decision in light of its decision in *Hamlin II*. *Lithia Motors, Inc. v. Yovan*, 349 Or 663, 249 P3d 1281 (2011). Accordingly, we review in detail the Supreme Court's decision in *Hamlin II*, which has reshaped the evaluation of the constitutionality of punitive damages awards in cases, like this one, where the compensatory damage award is small.

### *HAMLIN II* AND SMALL-DAMAGE CASES

Ken Hamlin filed an action against his employer, Hampton Lumber Mills, Inc., for its failure to reinstate him after he sustained a hand injury at work. He alleged that his employer had violated ORS 659A.043, which provides rights to reinstatement for injured employees, and the jury awarded Hamlin $6,000 in lost wages and $175,000 in punitive damages. *Hamlin II*, 349 Or at 530. On appeal, this court held in *Hamlin I* that the punitive damages award was unconstitutional because "the nearly 30:1 ratio between punitive and compensatory damages was well outside the asserted 4:1 limit for such cases[.]" *Id.* at 531. The Supreme Court allowed review and concluded that the amount of punitive damages awarded by the jury was constitutional. *Id.* at 543-44.

The Supreme Court explained the limitations that the Due Process Clause imposes on punitive damages awards, noting that due process prohibits "grossly excessive" punitive damage awards that "serve no legitimate state purpose and constitute an arbitrary deprivation of property." *Id.* at 532 (citing *Campbell*, 538 US at 417). However, the Supreme Court stated that, "'[i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow[,]' and that due process permits punitive damages that are 'reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence.'" *Id.* at 533 (brackets in *Hamlin II*) (quoting *Gore*, 517 US at 568).

After discussing the Due Process Clause generally, the Supreme Court turned to the three guideposts set out in *Gore*. *Id.* The court began with the second guidepost—the disparity between the punitive and compensatory damages awards—because Hamlin had challenged that analysis.

*Id*. at 532-33. The court explained that the United States Supreme Court's "repeated refusal to set any 'rigid benchmark' beyond which a punitive damages award becomes unconstitutional" is key to a proper understanding of the second guidepost. *Id*. at 533 (citing *Campbell*, 538 US at 424-25). More importantly for this case, the court noted that the United States Supreme Court "has recognized that a state may be unable to achieve its goals of deterrence and retribution if awards of punitive damages must, in all instances, be closely proportional to compensatory damages." *Id*.

A low compensatory damages award, the *Hamlin II* court explained,

> "'may properly support a higher ratio than high compensatory awards, if, *for example*, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach.'"

*Id*. at 534-35 (emphasis in *Hamlin II*) (quoting *Gore*, 517 US at 582). Thus, the court observed, the United States Supreme Court has recognized that state courts have flexibility when it comes to applying ratios, and but one example is the one identified in *Gore*—the highly egregious act that results in a small damage award. *Id*. at 534.

Another example, which the Supreme Court noted that this court had not considered in *Hamlin I*, is "'when the value of injury and the corresponding compensatory award are small.'" *Id*. (quoting *Exxon Shipping Co. v. Baker*, 554 US 471, 494, 128 S Ct 2605, 171 L Ed 2d 570 (2008)). The Supreme Court in *Hamlin II* emphasized that, in *Hamlin I*, we had *incorrectly* required both "particularly egregious" conduct by the tortfeasor and a small amount of compensatory damages before we would consider a higher ratio between punitive and compensatory damages, 349 Or at 534. In short, to come within the small compensatory damages exception, the defendant's conduct need not be particularly egregious.[2]

---

[2] Accordingly, the dissent's contrary reading of *Hamlin II*—"to come within the small compensatory damages exception, the defendant's conduct must be

The Supreme Court in *Hamlin II* also cautioned against slavish adherence to ratios between punitive damage and compensatory damage awards in small damage cases. It held that, regardless of the level of egregiousness of the tortfeasor's conduct,

> "when the compensatory damages award is small and does not already serve an admonitory function, the second guidepost—the ratio between punitive and compensatory damages—is of limited assistance in determining whether the amount of a jury's punitive damages award meets or exceeds state goals of deterrence and retribution."

349 Or at 536-37. The court explained that to rely too heavily on the ratio in those circumstances risks "interfering with legitimate state interests by striking down awards that are reasonably calculated to deter and punish illegal conduct and that are, therefore, constitutionally permitted." *Id.* at 537. The court therefore examined whether Hamlin's compensatory damages were small and did not serve an admonitory function. *Id.* at 537-38.

After determining that the ratio between the punitive damages award and compensatory damages award was, in fact, above a single digit at 22 to 1, the Supreme Court held that "$6,000 in lost wages is a relatively small recovery that we would not expect to serve an admonitory, as well as a compensatory function." *Id.* at 538. The court further noted that the defendant did not argue that, due to its financial circumstances, the compensatory damages award had a greater effect on it than on another defendant; thus, the court concluded that "the fact that the ratio between punitive and compensatory damages is greater than a single digit does not, in itself, indicate that the punitive damages that the jury awarded were 'grossly excessive.'" *Id.* at 538.

The Supreme Court then described the first guidepost—the degree to which a defendant's conduct is reprehensible—as "'[t]he most important indicium of reasonableness of a punitive damages award[.]'" *Id.* at 539 (brackets in *Hamlin II*) (quoting *Campbell*, 538 US at 419). Under that guidepost, a reviewing court considers whether

particularly egregious," 254 Or App at 339 (Wollheim, J., concurring in part, dissenting in part)—turns *Hamlin II* on its head.

> "'the harm caused was physical as opposed to economic, the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.'"

*Id.* (quoting *Campbell*, 538 US at 419). Stated another way, the United States Supreme Court has recognized that a state like Oregon has "a particular interest in deterring and punishing conduct that causes its citizens physical harm, evidences a disregard of their health or safety, or takes advantage of their vulnerability." *Id.* at 540.

The Supreme Court also included an additional reprehensibility subfactor in its analysis, namely, a defendant's statutory violation. The court reasoned that, by authorizing an award of punitive damages in ORS 659A.043, "the Oregon legislature has indicated its intent to deter and punish" employers that breach their obligations to reinstate injured workers and that, "[a]lthough the Supreme Court did not specifically identify the interest protected by ORS 659A.043 as a reprehensibility subfactor in *Campbell* and *Gore*, we think that the Oregon legislature's affirmative action to protect qualitatively similar state interests permits us to consider defendant's statutory violation in our reprehensibility analysis." *Id.* at 540-41. After considering all the reprehensibility subfactors, including the fact that the defendant's conduct included "intentional malice, trickery, or deceit," the court concluded that "defendant's conduct was more than minimally reprehensible." *Id.* at 541.

The Supreme Court then examined the third guidepost—comparable civil or criminal sanctions. *Id.* The court decided that the punitive damages award could exceed a single-digit multiplier without violating due process and that the amount of the punitive damages award was not "grossly excessive." *Id.* at 543-44. The court acknowledged that the jury's award in the case was different in order of magnitude from the multimillion dollar punitive damages award that United State Supreme Court invalidated in *Gore*. The court then examined awards of punitive damages in similar circumstances, specifically the punitive damages

caps applicable in Title VII employment discrimination cases. *See id*. at 542 ("Title VII places limits on the total amount of compensatory and punitive damages that may be awarded, ranging from a limit of $50,000 * * * to a limit of $300,000."). Lastly, the court also cited similar cases from numerous jurisdictions in which appellate courts had approved punitive damages awards that were in amounts and in ratios greater than the one present in *Hamlin II*. *See id*. at 542-43. Accordingly, the court concluded that the "ratio is higher than would be constitutionally permissible if the compensatory damages were more substantial, but is not so high that it makes the award 'grossly excessive.'" *Id*. at 543.

## APPLYING *HAMLIN II*

Without doubt, a case in which the jury awards $500 in compensatory damages is a small-damage case. The analysis in *Hamlin II*, with its focus on the first and third guideposts under *Gore*, therefore, applies. Applying *Hamlin II*, we conclude that the trial court erred by reducing the jury's award of $100,000 in punitive damages to $2,000. The jury's punitive damages verdict in this case comports with due process and should be reinstated.

*Hamlin II* requires us to reexamine the facts pertaining to the reprehensibility of plaintiff's conduct given the Supreme Court's emphasis on reprehensibility as the most important guidepost and its explication of the subfactors in the reprehensibility analysis. *See Hamlin II*, 349 Or at 539. The concurrence in *Lithia Motors I* viewed plaintiff's violation of the statute making its debt collection practices unlawful, ORS 646.639,[3] as relatively insignificant: "To the extent that plaintiff's actions violated ORS 646.639, they are reprehensible, but, on a sliding scale of reprehensibility, they fall at the lower end of the scale for the reasons noted above." *See Lithia Motors I*, 226 Or App at 582 (Edmonds, J., concurring).

---

[3] For example, it is an unlawful debt collection practice to "[u]se or threaten the use of force or violence to cause physical harm"; "[t]hreaten arrest or criminal prosecution"; "[t]hreaten the seizure, attachment, or sale of a debtor's property when such action can only be taken pursuant to court order without disclosing that prior court order proceedings are required"; "[u]se profane, obscene, or abusive language in communicating with a debtor"; or "[a]ttempt to or threaten to enforce a right or remedy with knowledge or reason to know that the right or remedy does not exist, or threaten to take any action that the debt collector does not take in the regular course of business." ORS 646.639(2).

Although the concurrence stated that plaintiff's violation of the Act made plaintiff's actions reprehensible, it did not analyze the fact that the legislature had chosen to punish and deter the debt collection practices at issue in this case as a separate subfactor in the reprehensibility analysis because it did not have the benefit of *Hamlin II*. *See* 349 Or at 540-42. Under ORS 646.641(1), the Act authorizes an award of punitive damages against debt collectors who engage in unlawful debt collection practices proscribed in ORS 646.639(2). By authorizing punitive damages, the Oregon legislature has recognized the harm that creditors may inflict on consumers and debtors, such as defendant, and has indicated its intent to deter and to punish creditors who engage in that type of conduct. Thus, in light of *Hamlin II*, it is insufficient to look merely at the extent to which plaintiff's actions violated ORS 646.639. The state's interest in enacting ORS 646.639 and authorizing punitive damages under ORS 646.641(1) is significant by itself.

In addition, it is bedrock law that, in Oregon, "calculating punitive damages is the function of the jury." *Parrott*, 331 Or at 555. Thus, we must view the facts in a way that favors the jury's award of $100,000 in punitive damages. *See id.* at 556 ("[W]e hold that, when reviewing a punitive damages award for excessiveness, the reviewing court must view the facts in the light most favorable to the jury's verdict if there is evidence in the record to support them."). That standard of review affects the analysis of a number of the subfactors in the reprehensibility analysis.

Financial vulnerability of the litigant who is awarded punitive damages is one of the subfactors in the reprehensibility analysis highlighted in *Hamlin II*. 349 Or at 539-40. Although the concurrence in *Lithia Motors I* recognized that defendant had retained a lawyer and had in the past worked by selling cars and so, in one sense, was not as vulnerable as other consumers buying a used car, 226 Or App at 582 (Edmonds, J., concurring), the concurrence did not focus on defendant's *financial* vulnerability. Defendant had limited financial resources and limited ability to obtain financing to buy a car. He had a wife and four children and made approximately $34,000 per year. He was spending $350 per month on gas alone because of his 100-mile

commute, and he was not able to make installment payments on his house when he bought the car. Plaintiff knew that defendant was financially vulnerable: plaintiff took the information for the customer credit application, obtained a credit report on defendant, submitted the credit application to a nonprime lender, and knew defendant received a "sub, sub-prime" loan with a 21.5 percent interest rate. Thus, a jury was entitled to conclude that defendant was financially vulnerable, and that subfactor also supported the jury's award of punitive damages.

Whether plaintiff engaged in malicious and deceitful conduct is another subfactor of the reprehensibility analysis. *Campbell*, 538 US at 419; *Hamlin II*, 349 Or at 539. The jury found that defendant proved "by clear and convincing evidence" either that (1) plaintiff had shown "a reckless and outrageous indifference to a highly unreasonable risk of harm" and had acted "with a conscious indifference" to the "welfare of others"; or (2) plaintiff had "acted with malice," *i.e.*, had engaged in a wrongful act "intentionally, without just cause or excuse," or had acted with "intentional disregard of the interest of another"; or (3) both. It is unclear whether the concurrence in *Lithia Motors I* accepted that plaintiff engaged in conduct evidencing "malice, trickery, or deceit," *Campbell*, 538 US at 419; the concurrence noted only that "plaintiff made repeated efforts to regain the vehicle and acted intentionally in its efforts." *Lithia Motors I*, 226 Or App at 582 (Edmonds, J., concurring). Stating the facts most strongly in favor of the verdict, as we must, the jury found that plaintiff acted with malice, and that finding supports the jury's award of punitive damages.

In addition, the jury was entitled to conclude that plaintiff engaged in trickery or deceit to further its own financial interests. The credit application plaintiff submitted to TranSouth showed that defendant earned more than he actually did, that plaintiff had exaggerated the car's accessories, and that the car had a lower mileage figure than the 125,000 miles it apparently actually had, due to an odometer rollback. Thus, the collateral for the car loan was overstated. After TranSouth learned that the car was worth less than what had been represented on the application, plaintiff had to repurchase the retail

installment contract from TranSouth and bear the risk of nonpayment on an under-secured loan. Plaintiff even lied to its parent company's collection manager when it told him to have the car repossessed. Plaintiff misrepresented to defendant and his attorney that defendant no longer had a valid purchase contract. Subsequently, plaintiff falsely told defendant's counsel that TranSouth had rescinded the retail installment contract. TranSouth had not rescinded the contract; plaintiff had repurchased the still-valid contract that plaintiff later sought to rescind in this case. Plaintiff also tried to intimidate or deceive defendant into relinquishing the car to plaintiff so that it could recover the full amount it had paid for the car from the seller in Idaho, rather than having to risk a loss on the car as a result of the sale to defendant. Plaintiff's repeated use of trickery or deceit supports the jury's award of punitive damages.

In sum, this record establishes that plaintiff's conduct was "more than minimally reprehensible." *Cf. Hamlin II*, 349 Or at 541. In fact, plaintiff's conduct was egregious, as the jury found, given proof that plaintiff in this case repeatedly used deceptive and abusive tactics against a financially vulnerable consumer to enhance its financial interests as well as plaintiff's arrogant presentation to the jury of its position that it had done nothing wrong. *Cf. Parrott*, 331 Or at 560-61.[4] Thus, the most important guidepost, the reprehensibility of plaintiff's conduct, supports the jury's award of punitive damages in excess of a single-digit multiplier of the $500 compensatory damages award in this case.

---

[4] In *Parrott*, the Supreme Court reiterated the facts establishing the "high degree of social irresponsibility" exhibited by the car dealership in that case:

"[t]here was evidence from which the jury could have found that defendant knew of the extensive defects of the Suburban and of its branded title and odometer discrepancy, and that it concealed those facts from plaintiff. There was evidence from which the jury could have concluded that defendant's treatment of plaintiff was not an isolated incident in that it had established business procedures that it could employ to cover any failure to disclose. There was evidence that defendant also used abusive tactics to cover its deceptions. Furthermore, from the evasive, inconsistent, and implausible explanations given by defendant's representatives as to defendant's business practices, the jury could infer that defendant had no intention of altering its practices in the future."

331 Or at 560-61 (brackets in original; internal quotation marks omitted).

Turning to the third guidepost—civil penalties in comparable cases—the Act provides a civil damages remedy rather than monetary penalties and, as a result, the Act itself is not significant in the analysis. *Hamlin II*, 349 Or at 541; *Lithia Motors I*, 226 Or App at 584 (Edmonds, J., concurring). The civil penalty for comparable UTPA violations, though, is relevant. The legislature has determined that a penalty of up to $25,000 can be assessed for *each* willful use of a method, practice, or act in violation of the UTPA. ORS 646.642(3). Multiple violations, therefore, could result in some cases in civil penalties in excess of the amount of punitive damages assessed in this case. Indeed, plaintiff engaged in multiple acts of deception and abuse in this case. The civil penalty available for UTPA violations further suggests that the punitive damages award in this case could exceed a single-digit multiplier of compensatory damages to serve the state's interest in deterring and punishing violations of the Act. Accordingly, the ratio between punitive damages and compensatory damages in this case can constitutionally exceed 9 to 1.

Our conclusion that we are not bound to impose a single-digit ratio between the punitive damage and compensatory damage awards in this case leads to the last step of the analysis called for in *Hamlin II*—namely, "whether the amount of punitive damages actually awarded * * * is, nevertheless, 'grossly excessive.'" 349 Or at 542. As to that analysis, we undertake a review of punitive sanctions in other cases with similar claims, as required by *Hamlin II. Id.*

In *Hamlin II*, the Supreme Court reviewed punitive damages awards in cases brought under other employment discrimination statutes, such as Title VII cases, as well as cases involving a variety of other torts and contract issues. *See id.* at 542-43 (citing representative cases). The Oregon Supreme Court has repeatedly approved punitive damages awards in amounts equal to or greater than $100,000, the amount in question here. *See, e.g., id.* at 542, 543 ($175,000 for committing an unlawful employment practice); *Parrott*, 331 Or at 565 ($1 million for violation of the UTPA). Courts in other jurisdictions have done so as well in consumer protection cases. *See, e.g., Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F3d 1024, 1026-27 (8th Cir), *cert den*, 531 US

825 (2000) (affirming punitive damages award of $100,000 and $50,000 against dealership; actual damages award of $5,300 and $2,535, for concealment of prior automobile wreck damages by dealerships in violation of the Missouri Merchandising Practices Act); *Electro Services, Inc. v. Exide Corp.*, 847 F2d 1524, 1525, 1530 (11th Cir 1998) (affirming punitive damages award of $3.5 million; compensatory damages award of $750,000, for an action against automotive battery manufacturer for deceptive trade practices); *Saunders v. Equifax Information Services, L.L.C.*, 469 F Supp 2d 343, 346, 356-57 (ED Va 2007) (in consumer action against bank and credit reporting agencies after bank improperly demanded full payment of car loan, repossessed car, and reported default to agencies, affirming $80,000 punitive and $1,000 compensatory damages awards); *United Technologies v. American Home Assur. Co.*, 118 F Supp 2d 174, 175, 181 (D Conn 2000) (affirming punitive damages award of $16 million for violations under the Connecticut Unfair Trade Practices Act); *Griffith v. Barnes*, 560 F Supp 2d 29, 37-38 (DDC 2008) (awarding punitive damages of $100,000 under the D.C. Consumer Protection Procedures Act where the defendant made misrepresentations to the plaintiff, but the plaintiff did not seek actual damages); *Thorsen v. Durkin Development, LLC*, 129 Conn App 68, 76-78, 20 A3d 707, 713-14 (2011) (affirming punitive damages award of $280,000; compensatory damages award of $30,211.43 for violations of the Connecticut Unfair Trade Practices Act). Accordingly, we conclude that a $100,000 punitive damages award is not outrageous or "grossly excessive" as measured by similar types of cases.[5]

Finally, $100,000 was a serious sanction, but the jury properly determined the amount of the sanction pursuant to their instructions to consider the sum of money that would be required to discourage plaintiff and others from engaging in such conduct in the future and plaintiff's

---

[5] And, although in this case the ratio of punitive damages to compensatory damages is 200 to 1, that fact alone does not make the punitive damages award "grossly excessive." *See TXO Production Corp. v. Alliance Resources Corp.*, 509 US 443, 459, 462, 113 S Ct 2711, 125 L Ed 2d 366 (1993) (affirming the Supreme Court of Appeals of West Virginia, which had affirmed a $10,000,000 punitive damages award in a slander of title case where the compensatory damages were $19,000, a 526-to-1 ratio).

income and assets. Plaintiff was fully on notice that the jury could assess punitive damages of that magnitude. In fact, plaintiff agreed that, if defendant were awarded all of the damages he sought, a judgment in his favor for $535,000 could and would be paid and specifically told the jury in the stipulation that it could pay $100,000 in punitive damages for violations of the Act:

> "[T]he new Lithia Toyota dealership has sufficient assets to fully pay all of the claims for damages of [defendant] including the punitive damages claims of 100,000 dollars on the Unlawful Debt Collection Practices Act and 250,000 dollars on his claim for punitive damages under Unlawful Trade Practices Act."

The amount the jury awarded as punitive damages is not grossly excessive given the deterrent function that it serves and the resources that plaintiff has to pay it.

The problem with rigidly applying rules concerning ratios in small-damage cases is illustrated by this case: an incremental change in the amount of compensatory damages awarded in small-damage cases will result in a large change in the amount of permissible punitive damages. So, for example, if the jury had awarded defendant just $1,500 more in noneconomic damages, then the result in this case—based on the dissent's "permissible" 50-to-1 ratio between punitive damages and $2,000 in noneconomic damages—would be affirmance of the $100,000 punitive damages award. A $1,500 change in a compensatory damage award should not make a $75,000 difference in constitutionally permissible punitive damages under a due process analysis.

In conclusion, the jury properly found from the evidence and its instructions that $100,000 was an appropriate amount of punitive damages in this case, and the trial court's invalidation of the jury's punitive damages award and its substitution of a $2,000 punitive damages award does not comport with *Hamlin II* and *Parrott*. The jury's award serves Oregon's interest in deterring and punishing violations of the Act and does not violate due process. We therefore reverse and remand for the trial court to reinstate the jury's award of punitive damages.

Reversed and remanded with instructions to reinstate the jury's award of punitive damages.

**WOLLHEIM, J.,** concurring in part, dissenting in part.

In light of the Supreme Court's analysis in *Hamlin v. Hampton Lumber Mills, Inc.*, 349 Or 526, 246 P3d 1121 (2011) (*Hamlin II*), I would conclude that an award of $25,000 is the maximum award of punitive damages that due process will allow and therefore, like the majority, concur in reversing and remanding. However, I respectfully dissent from the majority opinion that would reinstate the jury verdict awarding $100,000 in punitive damages.

## LITHIA MOTORS I

Even though the majority opinion sets out the facts in detail, I too will summarize the facts to set the stage for my dissent. The following facts are taken from the concurring opinion in *Lithia Motors, Inc. v. Yovan*, 226 Or App 572, 204 P3d 120 (2009) (*Lithia Motors I*), *vac'd and rem'd*, 349 Or 663 (2011), and from the record, in the light most favorable to the jury's verdict, consistently with our standard of review. *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 556, 17 P3d 473 (2001) ("[W]hen reviewing a punitive damages award for excessiveness, the reviewing court must view the facts in the light most favorable to the jury's verdict if there is evidence in the record to support them.").

On December 2, 2000, defendant bought a used 1993 Toyota 4Runner for $13,799, with a $300 down payment and $2,000 credit for his trade-in from plaintiff Lithia Medford LM, Inc., an auto dealership. 226 Or App at 574-75 (Edmonds, J., concurring). Defendant had previously worked at a used car dealership for three months and had bought five cars from dealerships before making this purchase.[1] Plaintiff informed defendant that it did not do financing and that the interest rate would be set by the finance company. Five days later, the retail installment contract was purchased by TranSouth Financial Corporation. *Id.* at 575 (Edmonds, J., concurring). After purchasing the car,

---

[1] Defendant testified that, because of his experience in working for a dealership, he knew "some of the tricks and the manipulation tactics that are [used]."

defendant obtained a report stating that the car had been driven 25,500 miles more than the odometer indicated. *Id.* (Edmonds, J., concurring). Then, defendant contacted the plaintiff. There is no evidence in the record that plaintiff was aware of the mileage discrepancy before defendant brought it to its attention. *Id.* (Edmonds, J., concurring). The parties were unsuccessful in reaching resolution. In late December, defendant's counsel sent a letter to plaintiff stating that defendant had decided to keep the vehicle, to continue making payments on his installment contract, and to sue plaintiff for damages, unless the parties could reach a settlement. *Id.* at 576 (Edmonds, J., concurring). Plaintiff responded that defendant had the choice of paying the full balance on the car or returning the car in exchange for his trade-in and deposit. In a phone conversation between defendant and plaintiff's manager, the manager threatened defendant with criminal prosecution for "Grand Theft Auto" if he did not return the car by the end of the week. *Id.* at 577 (Edmonds, J., concurring).

Several days later, a man came to defendant's house and told him that the dealership had contracted with him to repossess the car for nonpayment. *Id.* (Edmonds, J., concurring). Defendant told the man that his first payment was not yet due and that the installment contract was not held by the dealership. *Id.* (Edmonds, J., concurring). The man said that he would call the police and that defendant was obstructing justice. *Id.* (Edmonds, J., concurring). Defendant then placed the car in storage for three months. *Id.* (Edmonds, J., concurring).

After repurchasing the retail installment contract from TranSouth, plaintiff sent defendant a page from the sales contract, noting that, "if Seller is unable to assign the retail installment contract/lease agreement * * * Seller may to rescind the retail installment contract/lease agreement," which presumably was intended to provide a basis for plaintiff's position that it could rescind the contract. *Id.* at 577-78 (Edmonds, J., concurring) (emphasis omitted). Defendant pointed out that TranSouth had not rejected the financing arrangement; instead, plaintiff had repurchased the contract. *Id.* at 578 (Edmonds, J., concurring). In January, plaintiff made a final attempt to settle the matter by

offering to lower the financing amount by $1,000. *Id.* at 578-79 (Edmonds, J., concurring). Defendant rejected the offer, and the parties proceeded to trial.[2] *Id.* at 579 (Edmonds, J., concurring). Plaintiff brought an action for rescission based on mutual mistake, and defendant counterclaimed for violation of the Oregon Unlawful Debt Collections Practices Act. The trial court granted the claim for rescission.

At trial, defendant testified that his difficulties had caused disagreements with his wife and had contributed to his marriage ending. However, defendant's former wife testified that the marriage ended because defendant broke her nose. *Id.* (Edmonds, J., concurring). A clinical psychologist also testified that defendant had trouble sleeping, felt threatened, lost his job and his house, and that the conflict with the dealership was "a significant contributing factor to his distress." *Id.* at 579-80 (Edmonds, J., concurring). The parties stipulated that Lithia MTLM, Inc., had sufficient income and assets to pay a total of approximately $535,000 in damages and up to $100,000 in punitive damages. The jury did not award defendant any economic damages, but awarded him $500 in noneconomic damages for emotional injury and $100,000 in punitive damages. *Id.* at 574 (Edmonds, J., concurring). The trial court granted plaintiff's motion for remittitur, ruling that the maximum constitutionally permissible punitive damages award based on the facts of the case was $2,000. *Id.* (Edmonds, J., concurring).

Defendant appealed, and we affirmed by an equally divided court. *Id.* at 573. Because the concurring and dissenting opinions in *Lithia Motors I* provide background and inform my analysis, I describe those opinions in detail. The concurrence began its analysis by quoting from our opinion in *Hamlin v. Hampton Lumber Mills, Inc.*, 222 Or App 230, 238-39, 193 P3d 46 (2008) (*Hamlin I*), *rev'd*, 349 Or 526, 246 P3d 1121 (2011), in which we stated:

> "'Grossly excessive' punitive damage awards violate the Due Process Clause of the Fourteenth Amendment to the United

---

[2] Defendant did not raise the issue of the high interest rate in his operative amended answer, affirmative defenses and counterclaims, which the majority states is a basis for the jury's verdict. 254 Or App at 309, 324-25.

States Constitution, primarily because such damages serve no legitimate purpose and constitute arbitrary deprivations of property.[3] *BMW of North America, Inc. v. Gore*, 517 US 559, 568, 116 S Ct 1589, 134 L Ed 2d 809 (1996) *(Gore)*. In reviewing whether a punitive damage award is grossly excessive, we adhere to the following methodology set forth by the Oregon Supreme Court in *Goddard v. Farmers Ins. Co.*, 344 Or 232, 179 P3d 645 (2008). First, we review the evidence in the record in the light most favorable to the party that obtained the award to determine whether there is a factual predicate for a punitive damage award. *Id.* at 261. Second, we apply 'constitutionally prescribed guideposts to those predicate facts to determine if, as a matter of law, the award is grossly excessive.' *Id.* Those guideposts, first identified by the United States Supreme Court in *Gore*, are:

> "'(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.'

> "*State Farm Mut. Ins. v. Campbell*, 538 US 408, 418, 123 S Ct 1513, 155 L Ed 2d 585 (2003) *(Campbell)*; *see also Goddard*, 344 Or at 261-65, (describing and applying *Gore* guideposts). Finally, if that analysis leads us to conclude that the award is grossly excessive, we then use those same guideposts to determine the maximum lawful amount of punitive damages that a rational juror could award. *Goddard*, 344 Or at 261-62."

Under the first guidepost—the degree of reprehensibility of plaintiff's misconduct—the concurrence stated, "In this case, plaintiff's most egregious actions were its threat to commence criminal prosecution against defendant because of his failure to voluntarily return the car and its attempt to repossess the car from defendant." *Lithia Motors I*, 226 Or App at 581 (Edmonds, J., concurring). The concurrence added that

---

[3] The Fourteenth Amendment to the United States Constitution provides, in part, that "[n]o state shall * * * deprive any person of life, liberty, or property, without due process of law[.]"

"defendant was not a particularly vulnerable target of plaintiff's actions," and, "[t]o the extent that plaintiff's actions violated ORS 646.639, they are reprehensible, but, on a sliding scale of reprehensibility, they fall at the lower end of the scale * * *." *Id.* at 582 (Edmonds, J., concurring).

Under the second guidepost—the disparity between the actual or potential harm suffered by a plaintiff and the punitive damages award—the concurrence stated that "the ratio of punitive damages to compensatory damages is 200 to 1, far exceeding the four-to-one ratio established as the general ceiling for punitive damages where the only harm is financial and the putative single-digit limit for punitive damages involving personal injury." *Id.* (Edmonds, J., concurring). The concurrence noted again that "plaintiff's conduct was on the low end of the scale of reprehensibility" and concluded that "it cannot be said that the conduct was 'particularly egregious' so as to the due process ceiling in order to provide an incentive to bring an action." *Id.* at 583 (Edmonds, J., concurring). The concurrence compared the award that defendant sought for emotional harm ($150,000) with the damages for emotional harm that the jury awarded ($500). "The award of $500 is not substantial in the sense that it is not a large amount, but it is substantial in the sense that it has actual value in excess of the $200 nominal damage award provided for in ORS 646.641(1) in the event of a violation of the act." *Id.* (Edmonds, J., concurring).

Under the third guidepost—the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases—the concurrence stated that "[t]he most comparable sanction created by the legislature is in ORS 646.641(1), which provides a remedy in the amount of actual damages or $200, whichever is greater" and concluded that "the analysis under the third guidepost neither militates against nor supports a more substantial punitive damage award than the four-to-one ratio imposed by the trial court." *Id.* at 584 (Edmonds, J., concurring).

Based on the guideposts, the concurrence concluded that the jury's punitive damages award of $100,000 was grossly excessive. *Id.* (Edmonds, J., concurring). Although

the degree of reprehensibility of plaintiff's conduct was "significant," it was "not egregious." *Id.* at 585 (Edmonds, J., concurring). In addition, the jury's verdict demonstrated that the emotional damage that plaintiff caused to defendant was "relatively minimal." *Id.* (Edmonds, J., concurring). In conclusion, the concurrence stated:

> "Balancing all of the relevant factors discussed above, I conclude that any amount in excess of a four-to-one ratio would constitute a grossly excessive award that would serve no legitimate purpose and if upheld, would constitute an arbitrary deprivation of plaintiff's property. Accordingly, I would hold that the trial court did not err in reducing defendant's punitive damage award to $2,000 or a four-to-one ratio."

*Id.* (Edmonds, J., concurring).

In his dissenting opinion, Judge Armstrong argued that "the ratio loses its usefulness when we are confronted with a small compensatory award, as we are here." *Id.* at 588 (Armstrong, J., dissenting). Judge Armstrong stated that "deterrence has much less meaning when we apply the suggested single-digit ratios to smaller awards." *Id.* at 589 (Armstrong, J., dissenting). He went on to say:

> "The fact that the jury found only $500 of the $150,000 in emotional harm that defendant sought goes to the issue of defendant's damages, *not* plaintiff's conduct. What is more telling, in my view, is that the jury determined that plaintiff had engaged in very offensive behavior, and that that behavior warranted a punitive damage award of $100,000."

*Id.* at 590 (Armstrong, J., dissenting) (emphasis in original). Under the third guidepost in *Gore*, Judge Armstrong noted that the legislative policy permits civil penalties up to $25,000 and that "provides a more appropriate proportionality gauge for punitive damage awards in this and comparable circumstances—where egregious, prohibited conduct yields a small amount of compensatory damages—than does the single-digit formula." *Id.* at 592 (Armstrong, J., dissenting). Accordingly, he concluded that an award of $25,000 in punitive damages would not offend due process. *Id.* (Armstrong, J., dissenting). Thus, in Judge Armstrong's view, the jury's award of $100,000 did offend due process.

Judge Sercombe also wrote a dissenting opinion, stating, "In my view, due process prohibits a punitive damages award in excess of $4,500." *Id.* at 593 (Sercombe, J., dissenting). Judge Sercombe agreed with the majority that "plaintiff's conduct in this case falls on the lower end of the reprehensibility scale" and that "there are no special circumstances in this case that would justify a punitive damages award that would exceed the compensatory damages by more than a single-digit ratio." *Id.* (Sercombe, J., dissenting). However, Judge Sercombe argued that, under the second guidepost,

> "[t]he concurrence goes astray when it uses a four-to-one ratio as its starting point in determining the maximum punitive damages award that due process will permit. Rather, the 'rough numerical reference point' that the Supreme Court has established in a noneconomic injury case such as this one is nine to one. In my view, because nothing in the record in this case requires an adjustment to that initial amount, due process requires only a reduction of the $100,000 punitive damages award to $4,500."

*Id.* at 596-97 (Sercombe, J., dissenting) (quoting *Goddard v. Farmers Ins. Co.*, 344 Or 232, 259, 179 P3d 645 (2008)). Judge Sercombe reiterated that he agreed that "plaintiff's conduct is not very reprehensible in the universe of cases in which juries have awarded punitive damages." *Id.* at 598 (Sercombe, J., dissenting). But he would only have limited the judgment to $4,500 because "no court of which I am aware has used 'low reprehensibility' as the basis to decrease the amount of punitive damages below a single-digit ratio to compensatory damages." *Id.* (Sercombe, J., dissenting).

## HAMLIN

After our decision in *Lithia Motors I*, the Supreme Court issued its opinion in *Hamlin II*, 349 Or 526. In that case, the plaintiff sustained a compensable injury to his hand and was unable to work for four months. *Id.* at 528. The defendant, his employer, assured the plaintiff that his job was secure, but, when the plaintiff returned to work, the defendant "deliberately decided not to reinstate plaintiff and falsely asserted that he was a 'safety risk.'" *Id.* at 529. The plaintiff filed an action against the defendant, and, following

trial, the jury awarded the plaintiff lost wages of $6,000 and punitive damages of $175,000. *Id.* at 530. On appeal, this court held that the punitive damages verdict was unconstitutionally large and "the nearly 30:1 ratio between punitive and compensatory damages was well outside the asserted 4:1 limit for such cases[.]" *Id.* at 531. We concluded that "the constitutional limit on the punitive damages award was four times the amount of the compensatory damages award (*i.e.*, four times $6,000 plus prejudgment interest)."[4] *Id.*

The Supreme Court allowed review. After reviewing the decisions of the United States Supreme Court that discuss the limitations that the Due Process Clause imposes on awards of punitive damages—in particular, the three guideposts—our Supreme Court held that we had erred in reversing the jury's punitive damages verdict and reinstated it. *Id.* at 543-44. The court stated, "Key to understanding the second guidepost is the Supreme Court's repeated refusal to set any 'rigid benchmark' beyond which a punitive damages award becomes unconstitutional." *Id.* at 533. The court noted that the United States Supreme Court "also has recognized that a state may be unable to achieve its goals of deterrence and retribution if awards of punitive damages must, in all instances, be closely proportional to compensatory damages." *Id.* But, "when the compensatory damages award is small and does not already serve an admonitory function, the second guidepost—the ratio between punitive and compensatory damages—is of limited assistance in determining whether the amount of a jury's punitive damages award meets or exceeds state goals of deterrence and retribution." *Id.* at 536-37.

Before considering the ratio between the punitive and compensatory damages, the court said that it had to identify the damages awarded and calculate the ratio between them; in that case, the ratio was approximately 22 to 1. *Id.* at 537. The court stated that "the process of identifying due process limits demands flexibility and a consideration of the facts and circumstances that each case presents," but

---

[4] Thus, at the time of our decision in *Lithia Motors I*, our decision in *Hamlin I* was "controlling." An award of punitive damages could not exceed a single-digit ratio to compensatory damages.

noted that it had "characterized an award of compensatory damages of less than $25,000 as 'relatively small' and 'low.'" *Id.* (quoting *Williams v. Philip Morris Inc.*, 340 Or 35, 127 P3d 1165 (2006), *vac'd*, 549 US 346, 127 S Ct 1057, 164 L Ed 2d 940 (2007)). The court concluded that $6,000 in lost wages was a relatively small recovery that it would not expect to serve an admonitory, as well as a compensatory, function and that "the fact that the ratio between punitive and compensatory damages is greater than a single digit does not, in itself, indicate that the punitive damages that the jury awarded were 'grossly excessive.'" *Id.* at 538 (footnote omitted). The court also cited *Campbell* to note that the reprehensibility guidepost is the most important indicium of the reasonableness of a punitive damages award. *Hamlin II*, 349 Or at 539. The court stated that the "defendant's conduct was more than minimally reprehensible," and the "defendant's conduct may justify an award of punitive damages in excess of a single-digit multiplier of the compensatory damages award." *Id.* at 541. Ultimately, the court concluded:

> "In this case, the compensatory damages are small and the ratio between the punitive and compensatory damages—22:1—is in the low double digits. That ratio is higher than would be constitutionally permissible if the compensatory damages were more substantial, but is not so high that it makes the award 'grossly excessive.'"

*Id.* at 543.

## PUNITIVE DAMAGES ANALYSIS

After its decision in *Hamlin I*, the Supreme Court vacated our decision in *Lithia Motors I*, 226 Or App 572, and remanded for reconsideration in light of *Hamlin*. 349 Or 663. On remand, plaintiff asserts that our previous decision in this case is not affected by *Hamlin II* and, therefore, our earlier opinion should remain undisturbed. Defendant responds that, in *Hamlin I*, the Supreme Court adopted a new methodology and, based on the analysis in that case, this court should reinstate the jury's $100,000 punitive damages award. Thus, as the majority correctly states, 254 Or App at 309, the narrow question for the court to address on remand is whether this court erred in affirming the trial court's award of punitive damages in a ratio of 4 to1 under

the Supreme Court's decision in *Hamlin II*. I agree with the majority that this court erred in affirming the trial court. However, in applying the three guideposts from *Gore* in light of the Supreme Court's decision in *Hamlin II* to the facts of this case, I would reach a different result than the majority.

As noted, the first guidepost requires the court to assess the degree of reprehensibility of plaintiff's conduct. Importantly, the court in *Hamlin II* stated that the reprehensibility guidepost is the most important indicium of the reasonableness of a punitive damages award. 349 Or at 539. Relying on *Exxon Shipping Co. v. Baker*, 554 US 471, 494, 128 S Ct 2605, 171 L Ed 2d 570 (2008), the court noted in *Hamlin II* that, to come within the small compensatory damages exception, the defendant's conduct must be particularly egregious. *Hamlin*, 349 Or at 534. Here, the concurrence stated repeatedly that plaintiff's conduct was on the low end of the scale of reprehensibility. *Lithia Motors I*, 226 Or App at 583 (Edmonds, J., concurring); *cf. Parrott*, 331 Or at 560, 562 (concluding that defendant "committed an extraordinarily egregious violation of the UTPA" and his "conduct was highly reprehensible" (internal quotation marks omitted)).[5] In addition, in his dissent in *Lithia Motors I*, Judge Sercombe agreed that "plaintiff's conduct in this case falls on the lower end of the reprehensibility scale." *Id.* at 593 (Sercombe, J., dissenting). Thus, a majority of the judges on this court agreed that plaintiff's conduct was on the low end of the reprehensibility scale. Plaintiff's conduct did not change following the Supreme Court's decision on remand:

---

[5] The majority relies largely on *Parrott* and implies that it is factually similar to this case. 254 Or App at 326 n 4. In *Parrott*, however, there was evidence that the defendant dealership knew of the title and odometer discrepancy and concealed those facts from the plaintiff, that it "used abusive tactics to cover its deceptions," the defendant routinely asked customers to sign blank, undated, or incomplete forms, the defendant's failures to disclose prior damage to the vehicle showed indifference to the health and safety of the public, and the jury could infer that it had no intention of altering its practices in the future. 331 Or at 560-61.

Here, there is no evidence that plaintiff knew of the odometer discrepancy and there is no evidence in the record that this was more than an isolated incident. Neither is there evidence of hiding damage to the 4Runner, nor evidence that plaintiff's conduct showed indifference to the health and safety of the public. That is why I disagree with the majority's attempt to describe the facts in *Parrott* as similar to plaintiff's acts. In addition, it is worth repeating that plaintiff sought and obtained rescission of the contract based on *mutual* mistake.

its conduct was on the low end of the reprehensibility scale. Plaintiff's conduct was sufficiently improper that an award of punitive damages was appropriate, but there is no evidence that plaintiff's conduct was particularly egregious to warrant a ratio that would allow an award of $100,000 in punitive damages.[6]

The second guidepost requires the court to examine the ratio between the punitive damages award and the potential harm suffered by defendant as the result of plaintiff's actions. The concurrence in *Lithia Motors I* stated that the 4 to 1 ratio has been "established as the general ceiling for punitive damages where the only harm is financial and the putative single-digit limit for punitive damages involving personal injury." 226 Or App at 582 (Edmonds, J., concurring). However, the Supreme Court in *Hamlin II* stated that the 4 to 1 ratio is of limited assistance when the compensatory damages award is small and does not already serve an admonitory function. 349 Or at 536-37. Thus, the goalpost for the second guidepost moved after our decision in *Lithia Motors I*.

The award in this case of $500 in noneconomic damages for emotional injury is well under the $25,000 that the Supreme Court has characterized as "relatively small" and "low." *Hamlin II*, 349 Or at 537 (internal quotation marks omitted). Accordingly, I agree with the majority that $500 is a small recovery that would not serve an admonitory, as well as compensatory, function. As noted, the ratio of punitive damages to compensatory damages awarded by the jury was 200 to 1. But, even if the punitive damages award may exceed a single-digit multiplier of the compensatory damages award without violating due process, the court still must decide whether the amount of punitive damages suggested by the jury's verdict is "grossly excessive." *Id.* at 541-42.

---

[6] The majority notes that, in *Hamlin II*, the Supreme Court added a subfactor of legislative intent in punishing a party's statutory violation. 254 Or App at 323. The majority goes on to say that, "[b]y authorizing punitive damages, the Oregon legislature has recognized the harm that creditors may inflict on consumers and debtors, such as defendant, and has indicated its intent to deter and to punish creditors who engage in that type of conduct." *Id.* at 324. However, that is true of any statute in which the legislature has authorized punitive damages. Accordingly, I do not agree that the punitive damages that the legislature authorized in ORS 646.641(1) add to plaintiff's reprehensibility.

Finally, the third guidepost requires the court to consider comparable civil sanctions. As Judge Armstrong pointed out in his dissent, "the unlawful trade practice statutes also authorize the state, through district attorneys and the Attorney General, to bring actions to enjoin unlawful trade practices, ORS 646.632, and to recover civil penalties up to $25,000 for each trade practice violation." *Lithia Motors I*, 226 Or App at 591 (Armstrong, J., dissenting).[7] Accordingly, I would conclude that punitive damages of $25,000—the amount that would be allowed as a civil sanction for an unlawful trade practice—are appropriate.

In sum, under the three guideposts, I would conclude that plaintiff's conduct was on the low end of the reprehensibility scale and not particularly egregious, the compensatory damages award is small and the 200 to 1 ratio of punitive damages to compensatory damages awarded by the jury is grossly excessive, and the comparable civil sanctions provide civil penalties, paid to the state, of up to $25,000. Based on these factors, punitive damages of $25,000—a ratio of 50 to 1—would be appropriate and would not violate due process in this case.

For those reasons, I respectfully dissent.

Haselton, C. J., Schuman, and Hadlock, JJ., join in this dissent.

---

[7] ORS 646.642(1) provides:

"Any person who willfully violates the terms of an injunction issued under ORS 646.632 shall forfeit and pay to the state a civil penalty to be set by the court of not more than $25,000 per violation. For the purposes of this section, the court issuing the injunction shall retain jurisdiction and the cause shall be continued, and in such cases the prosecuting attorney acting in the name of the state may petition for recovery of civil penalties."