Argued and submitted September 9, 2014, affirmed July 15, petition for review denied November 12, 2015 (358 Or 248)

Paul Scott Schwarz,
Personal Representative of the
ESTATE OF MICHELLE SCHWARZ,
*Plaintiff-Respondent,*

*v.*

PHILIP MORRIS USA, INC.,
a foreign corporation,
*Defendant-Appellant,*

*and*

ROTHS IGA FOODLINER, INCORPORATED,
*Defendant.*

Multnomah County Circuit Court
000201376; A152354

355 P3d 931

William F. Gary argued the cause for appellant. With him on the opening brief were Sharon A. Rudnick, J. Aaron Landau, and Harrang Long Gary Rudnick P.C. With him on the reply brief were Sharon A. Rudnick and Harrang Long Gary Rudnick P.C.

James S. Coon argued the cause for respondent. With him on the brief was Swanson, Thomas, Coon & Newton,

D. Lawrence Wobbrock, Charles S. Tauman, and Richard A. Lane.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

SERCOMBE, P. J.

## SERCOMBE, P. J.

The issue in this "low tar" tobacco case centers on a jury's award of punitive damages to plaintiff against defendant Phillip Morris USA, Inc. (Philip Morris). Following a trial in 2002, the jury awarded plaintiff $168,514 in compensatory damages and $150 million in punitive damages.[1] However, concluding that the trial court had not properly instructed the jury on the issue of punitive damages, the Oregon Supreme Court remanded the case to the trial court for a new trial limited to the amount of punitive damages. *Estate of Michelle Schwarz v. Philip Morris Inc.*, 348 Or 442, 235 P3d 668 (*Schwarz I*), *adh'd to as modified on recons*, 349 Or 521, 246 P3d 479 (*Schwarz II*) (2010). Thereafter, following a trial in 2012, a jury awarded plaintiff $25 million in punitive damages. Defendant appeals, raising four assignments of error. We reject without discussion defendant's second, third, and fourth assignments and write only to address its first assignment, in which it contends that the "trial court erred in refusing to reduce the punitive damages award pursuant to ORS 31.730(2) and (3) because the award is arbitrary and excessive, in violation of Oregon law and federal due process." (Boldface omitted.) As explained below, we conclude that the trial court did not err and, accordingly, affirm.

The background of this case was recounted in *Schwarz I*. In 2000, plaintiff, who is the husband of and personal representative for decedent Michelle Schwarz, brought an action against defendant, Philip Morris. *Schwarz I*, 348 Or at 445. Plaintiff asserted claims for relief "based on allegations of negligence, strict product liability, and fraud in the manufacturing, marketing, and research of defendant's brand of low-tar cigarettes." *Id.* Plaintiff "adduced the following evidence" at the first trial in 2002:

"Michelle Schwarz began smoking cigarettes in 1964 when she was 18 years old. She attempted to quit smoking numerous times but was unable to do so. In 1976, defendant introduced a new product, Merit cigarettes, to the market for tobacco products. Advertisements for the new brand

---

[1] The trial court later reduced the punitive damages award to a total of $100 million.

touted that the cigarettes contain less tar than existing 'full flavor' cigarettes but still tasted like the full-flavor brands. Out of a belief that 'low tar and nicotine filters are better for you,' decedent switched from a full-flavor brand that defendant manufactured to its low-tar Merit brand. After switching brands, decedent continued to smoke the same quantity of cigarettes—approximately one pack per day—but subconsciously altered her method of smoking. She took longer puffs, inhaled the smoke more deeply, and held it longer in her lungs. In 1999, at the age of 53, decedent died from a brain tumor that was the result of metastatic lung cancer.

"The method of smoking that decedent had adopted after switching to defendant's low-tar brand was consistent with the behavior of smokers generally. Persons addicted to nicotine in cigarettes tend to develop a certain 'comfort level' of nicotine, and, when smoking cigarettes that contain less nicotine, those smokers are likely to 'compensate'—that is, adjust subconsciously the manner in which they smoke—in order to achieve that 'comfort level.' Compensation causes smokers of low-tar cigarettes to inhale the same levels of tar, the primary carcinogen found in cigarettes, as they would ingest by smoking a full-flavored brand. Defendant was not only aware of the phenomenon, that awareness played a major role in the development of its low-tar brand. A primary purpose of defendant's decision to bring low-tar cigarettes to market was to give smokers what one tobacco executive labeled a 'crutch,' that is, a product that enabled smokers to rationalize continued indulgence of a habit that they otherwise would consider to be deadly.

"Defendant's behavior with respect to the development and marketing of low-tar cigarettes was but one iteration of a larger pattern of deceiving smokers and the rest of the public about the dangers of smoking. *See* [*Estate of Michelle*] *Schwarz* [*v. Philip Morris Inc.*, 206 Or App 20, 29-35, 135 P3d 409 (2006)]; *Williams v. Philip Morris Inc.*, 340 Or 35, 39-43, 127 P3d 1165 (2006), * * * *vac'd on other grounds by* [*Philip Morris USA v. Williams*], 549 US 346, 127 S Ct 1057, 166 L Ed 2d 940 (2007), *on remand*, 344 Or 45, 176 P3d 1255, *cert dismissed*, [556 US 178], 129 S Ct 1436, 173 L Ed 2d 346 (2009) (explaining in greater detail defendant's conduct). Beginning in the mid-1950s (when reports first emerged about a link between smoking and lung cancer and other deadly diseases) and enduring

throughout decedent's smoking life, defendant conspired with other cigarette manufacturers to wage a massive dis-information campaign designed to create the perception of uncertainty about the health risks of cigarettes, when in fact research by those same tobacco companies confirmed the adverse health consequences of smoking."

*Id.* at 445-47.

In a special verdict, the jury found defendant liable on all three of plaintiff's claims; on the negligence and strict product liability claims, the jury apportioned to Michelle Schwarz 49 percent of the fault.

"The jury awarded $118,514.22 in economic damages, $50,000 in noneconomic damages, and punitive damages on each of plaintiff's three claims: $25 million on the negligence claim, $10 million on the strict product liabil-ity claim, and $115 million on the fraud claim, for a total punitive damages award of $150 million. Defendant made a post-verdict motion to reduce the punitive damages award. The trial court ruled that that award was 'grossly excessive' and, without apportionment among the claims, reduced the punitive damages award to a total of $100 million."

*Id.* at 450. On review before the Supreme Court, defendant asserted, and the court agreed, that the trial court had not properly instructed the jury regarding punitive damages. *Id.* at 458. Accordingly, the court vacated the punitive dam-ages award and remanded the case for a new trial limited to the question of punitive damages. *Id.* at 460. On recon-sideration, the court clarified that the issue on remand was not whether defendant is liable for punitive damages, but, instead, what was the correct amount of those damages:

"At trial of this case, the court instructed the jury that, to recover punitive damages, plaintiff had to show, by clear and convincing evidence, that defendant had '"shown a reckless and outrageous indifference to a highly unreason-able risk of harm and [had] acted with a conscious indif-ference to the health, safety, and welfare of others."' 348 Or at 447. By awarding punitive damages in any amount, the jury necessarily found that defendant's conduct was as described and that defendant was liable for punitive damages. Defendant did not challenge, on appeal, the suf-ficiency of the evidence to support that conclusion, and that conclusion is not subject to retrial on remand. As we

explained in our earlier opinion, *id.* at 458, the jury was permitted to use evidence of harm to others to assess the reprehensibility of defendant's conduct and, working from that factual premise, to determine defendant's liability for punitive damages, and the trial court did not err in that aspect of its instruction to the jury.

"The trial court also instructed the jury that, if it found that defendant's conduct was as described, it could consider various factors, including the likelihood of serious harm and the degree of defendant's awareness of that harm, and award an amount of punitive damages not to exceed $300 million. In doing so, the trial court erred in failing to inform the jury that, while it could use evidence of harm to others to determine the reprehensibility of defendant's conduct, it could not directly punish the defendant for that harm. *Id.* Thus, that error likely affected the jury's determination of the amount of punitive damages to award and that was the limited reason that we decided that a new trial was necessary. We remanded this case to the trial court for a 'new trial limited to the question of punitive damages.' *Id.* at 460. That wording may lack precision. The logic of our earlier opinion made it plain that the trial court's instructional error had incorrectly stated the law that governed the jury's determination of the amount of punitive damages, not the jury's decision that punitive damages should be awarded. We therefore clarify that, in remanding for a new trial, we intended for a new trial limited to the *amount* of punitive damages."

*Schwarz II*, 349 Or at 523-24 (emphasis and brackets in original).

On remand, plaintiff presented what he referred to as a "streamlined" case, seeking a determination of punitive damages only on his fraud claim, and not his negligence and strict product liability claims.

At the beginning of the trial, the court instructed the jury, among other things, regarding the binding verdict of the jury from the 2002 trial. Specifically, the jury was instructed, at the outset of the case:

"The first jury found the following facts by clear and convincing evidence:

"No. 1:  Philip Morris made false representations that low-tar cigarettes delivered less tar and nicotine to the

smoker and were, therefore, safer and healthier than regular cigarettes and an alternative to quitting smoking.

"No. 2: Philip Morris knew the representations were false or recklessly made the representations without knowing if they were true or false.

"No. 3: Philip Morris intended to mislead Michelle Schwarz.

"No. 4: Michelle Schwarz reasonably relied on Philip Morris's representations.

"And No. 5: Michelle Schwarz suffered injury and death as a direct result of her reliance on Philip Morris's misrepresentations.

"* * * * *

"The first jury found that Philip Morris was liable for punitive damages for fraud. The first jury found by clear and convincing evidence that Philip Morris's conduct demonstrated a reckless and outrageous indifference to a highly unreasonable risk of harm and that Philip Morris acted with a conscious indifference to the health, safety and welfare of others.

"Based on the above finding, you must determine the appropriate amount of punitive damages that is necessary to punish Philip Morris's fraudulent acts as found by the first jury, to deter Philip Morris [from] committing these and similar fraudulent acts in the future and to deter others similarly situated from like conduct in the future."

The court emphasized that, during the trial, the jury might hear evidence

"that concerns the degree of reprehensibility of Philip Morris's conduct described above. Such evidence may not be considered for the purpose of contradicting any of the first jury's findings. Neither party may prove that Philip Morris never made false representations, that Philip Morris did not intend to deceive Mrs. Schwarz or that she was in any way at fault for relying on Philip Morris's false representations. You may consider such evidence only for the purpose of determining the degree of reprehensibility of Philip Morris's conduct and the amount of punitive damages that Philip Morris should pay."

The retrial jury was also instructed that the first jury had awarded $118,514.22 for the estate's economic damages and

$50,000 for its noneconomic damages, "for a total of $168,514.22 in compensatory damages for the estate's losses, including Mrs. Schwarz's medical and funeral expenses, her disability and pain and suffering; and her spouse's and children's loss of her society, companionship and services." However, the court instructed the jury, "Oregon law does not provide compensatory damages for loss of life to the person who has died or to her estate in this type of case."

At the second trial, in addition to the binding conclusions of the first jury, there was evidence presented, as in the first trial, related to defendant's financial condition and its conduct in relation to the low-tar fraud. We recount the facts on those issues in the light most favorable to plaintiff. *See Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 542, 17 P3d 473 (2001) ("We view the evidence, and the reasonable inferences to be drawn therefrom, in the light most favorable to plaintiff, the party in whose favor the jury returned the verdict.").

Throughout the years, after studies in the 1950s began to link cigarette smoking and, particularly, tar with disease, defendant reacted by attempting to cast doubt on that connection. In addition, defendant denied that nicotine was addictive. Defendant continued to take a public position until the late 1990s that nicotine was not addictive and that smoking had not been proven to cause disease.

However, in 1964, following the release of the Surgeon General's widely publicized report linking smoking to disease, while continuing to deny an established connection between smoking and disease, defendant also reacted by, among other things, seeking to develop what one executive called "a psychological crutch and a self-rationale to continue smoking." After the Surgeon General's report was released, defendant looked into the market potential of a "health cigarette." An internal confidential report on that issue noted that many smokers were concerned about the relationship of cigarette smoking to health. According to the report, women, "particularly, young women, would constitute the greatest potential market for a health cigarette." Furthermore, it concluded that the "illusion of filtration is as important as the fact of filtration" and, therefore, a new

"health" cigarette should use a "radically different method of filtration but need not be any more effective."

Having recognized the potential for such a health cigarette and consumer taste for "lighter products," defendant began marketing Merit cigarettes in 1976. Those cigarettes contained filters, porous paper, and "puffed" tobacco, all of which resulted in lower tar and nicotine ratings when they were smoked by the Federal Trade Commission (FTC)-standard testing machine.[2] However, as defendant knew, people do not "smoke like the machine." Instead, people who are addicted to nicotine compensate—they subconsciously adjust the way they smoke by, among other things, covering the holes in the filter, inhaling more deeply, holding smoke longer in their lungs, or taking more puffs of each cigarette. Smokers compensate in order to continue taking in the same amount of nicotine as they have become used to. Defendant knew that, as a result of compensation, smokers of low-tar cigarettes smoke in such a way that they inhale much more tar than the FTC machine would predict; compensation causes smokers of low-tar cigarettes to inhale the same amount of tar as they would if smoking a "full flavor" brand of cigarettes. Nonetheless, defendant considered the FTC-standard test favorable because it gave "low numbers." Indeed, defendant's purpose was to give smokers a way to rationalize continuing to smoke in the face of the evidence that smoking causes disease.

According to a document on the history of Merit cigarettes from defendant's files, Merit marketing was centered on the premise that the cigarette delivered both low tar and great taste. Defendant spent record amounts to advertise the introduction of Merit, designing "provocative headlines and important looking copy which looked like it had real news value." Such headlines—"Tar/Taste Theory Exploded! - Smoke Cracked! - Taste Barrier Broken!"—gave the message that Merit provided "low tar with taste." (Underscoring omitted.) Over the years, defendant engaged in various advertising campaigns to promote Merit cigarettes, including

---

[2] The FTC machine "smokes" cigarettes by drawing standard preset "puffs" of smoke into the machine at set intervals until a set length of the cigarette is burned.

continuing to use "its original reportorial format" and a "blind challenge" in which smokers were sent "two unidentified packs of Merit" and a letter emphasizing those cigarettes' "benefits versus their own brand." One of the primary objectives of defendant's advertising was to "point out Merit's tar advantage over competitive low tar brands."

Michelle Schwarz, who had been smoking since she was 18 years old, switched from smoking full-flavor cigarettes to Merit cigarettes when they were released in 1976. Although she had switched with the understanding that low-tar cigarettes were safer, after switching, she changed the way that she smoked, as described above.

In 1999—the year that Michelle Schwarz died—after denying the link between smoking and disease for decades, defendant began to publicly acknowledge that smoking causes cancer. As required by law and its Master Settlement Agreement (MSA) with the states, *see Williams v. RJ Reynolds Tobacco Company*, 351 Or 368, 373, 271 P3d 103 (2011) (attorneys general of 46 states entered into a "global settlement agreement with Philip Morris and the other tobacco companies" in which, among other things, the tobacco companies agreed "to adhere to restrictions on their advertising and marketing"), defendant's advertising of cigarettes was significantly limited. Defendant also started a website that included information regarding the health effects of smoking. However, until 2010, when the law changed to prohibit it, defendant continued to call its cigarettes "light" and "low tar."

The jury also heard evidence relating to defendant's financial condition. According to plaintiff's expert, defendant is extremely strong financially. In the several years before trial, its net earnings had been several billion dollars per year. For example, according to the expert, defendant's earnings in 2010 were $3.3 billion, with net daily earnings for that period at a little over $9 million, and defendant is worth approximately $50 billion.[3] There was also evidence

---

[3] The financial information presented related to defendant, Philip Morris USA, Inc. There was evidence that Philip Morris USA, Inc., does business only in the United States and United States territories. In addition, we note that there was evidence that, although defendant makes payments to the states under the MSA, the cost of those payments is passed on to cigarette purchasers through settlement-related price increases.

that defendant's sale of low-tar cigarettes accounts for a significant percentage of its total sales.

At the end of the parties' presentation of evidence, the court again instructed the jury regarding the first jury's binding conclusions. In particular, it again instructed the jury that the first jury had conclusively determined, by clear and convincing evidence, that (1) defendant made false representations that low-tar cigarettes delivered less tar and nicotine to the smoker and were, therefore, safer and healthier than regular cigarettes and an alternative to quitting smoking; (2) defendant knew those representations were false or recklessly made them without knowing if they were true or false; (3) defendant intended to mislead Michelle Schwarz; (4) Michelle Schwarz reasonably relied on the false representations; (5) as a result of that reliance, Michelle Schwarz suffered injury and death; (6) defendant's conduct demonstrated a reckless and outrageous indifference to a highly unreasonable risk of harm; and (7) defendant acted with a conscious indifference to the health, safety, and welfare of others. It instructed that, because

"the Oregon Supreme Court has ordered that the new jury consider only one issue, the amount of punitive damages, it is improper for you to second-guess, question or re-examine the findings made by the first jury. Those findings are binding on you, on the Court and on the parties and must be followed. You are therefore required to make an award of punitive damages in this case and the only question for you to decide is the amount of those punitive damages."

After deliberating, the jury awarded plaintiff punitive damages of $25 million. Thereafter, defendant moved to reduce the jury's award pursuant to ORS 31.730(2), asserting that the award was grossly and unconstitutionally excessive. Defendant also argued that plaintiff failed to present sufficient evidence to support any award above a nominal amount and asserted that "the court should enter judgment in favor of plaintiff in a nominal amount, such as $1" because any award above such a nominal amount was "arbitrary." The trial court denied the motion and entered a general judgment awarding punitive damages of $25 million.

As noted, on appeal, defendant contends that the trial court erred in failing to reduce the jury's award of

punitive damages pursuant to ORS 31.730(2) and (3) because the punitive damages award is "arbitrary and excessive, in violation of Oregon law" and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. (Boldface omitted.) In particular, defendant asserts that the "record in this case * * * cannot support anything more than a nominal award" of punitive damages and that any amount above a nominal award was arbitrary. Defendant further argues that, even if the jury could award "*some* non-negligible amount of punitive damages, the amount it *did* award was unconstitutionally excessive." (Emphases in original.) As explained below, we reject defendant's assertion that there was no evidence to support more than a nominal award of punitive damages and conclude that the award of punitive damages was not unconstitutionally excessive. Accordingly, the trial court did not err in denying defendant's motion to reduce the award under ORS 31.730.

Pursuant to ORS 31.730(1), in a civil case, punitive damages are recoverable only where it has been proven "by clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." Here, however, as noted, whether that standard was met was not before the jury on retrial. As the Supreme Court held, in the first trial, the jury, in awarding punitive damages, necessarily found that defendant had shown a reckless and outrageous indifference to a highly unreasonable risk of harm and had acted with a conscious indifference to the health, safety, and welfare of others. *Schwarz II*, 349 Or at 523. Thus, as the court made clear, that determination by the first jury as to defendant's conduct was not in question; the *only* issue to be considered by the jury on remand was the appropriate *amount* of punitive damages.

Pursuant to ORS 31.730(2),

"[i]f an award of punitive damages is made by a jury, the court shall review the award to determine whether the award is within the range of damages that a rational juror would be entitled to award based on the record as a whole, viewing the statutory and common-law factors that allow

an award of punitive damages for the specific type of claim at issue in the proceeding."

Furthermore, in addition to any reduction that may be made under subsection (2), pursuant to ORS 31.730(3),

"upon motion of a defendant the court *may* reduce the amount of any judgment requiring the payment of punitive damages entered against the defendant if the defendant establishes that the defendant has taken remedial measures that are reasonable under the circumstances to prevent reoccurrence of the conduct that gave rise to the claim for punitive damages. In reducing awards of punitive damages under the provisions of this subsection, the court shall consider the amount of any previous judgment for punitive damages entered against the same defendant for the same conduct giving rise to a claim for punitive damages."

(Emphasis added.)

In this case, in its final instructions, the court instructed the jury that, in deciding the amount of punitive damages, among other things, it should consider the following criteria:

"The likelihood at the time that serious harm would arise from the defendant's misconduct; the degree of defendant's awareness of that likelihood; the profitability of defendant's misconduct; the duration of the misconduct and any concealment of it ***; the attitude and conduct of the defendant upon discovery of the misconduct; and the financial condition of the defendant, but you may not increase the punitive damage *** award above an amount that is appropriate merely because a defendant has substantial financial resources."[4]

---

[4] We observe that, although the punitive damages claim at issue in the second trial was for fraud, the factors on which the jury was instructed mirror the factors to be considered pursuant to ORS 30.925(2) in making a punitive damages award in a product liability civil action. *See also* ORS 30.900 (a product liability civil action is "a civil action brought against a manufacturer, distributor, seller or lessor of a product for damages for personal injury, death or property damage arising out of" any "design, inspection, testing, manufacturing or other defect in the product"; "failure to warn regarding a product"; or "failure to properly instruct in the use of a product"); *Williams v. Philip Morris Inc.*, 344 Or 45, 58, 176 P3d 1255 (2008), *cert dismissed as improvidently granted*, 556 US 178 (2009) ("Oregon law provides that, in product liability actions (such as the present case), punitive damages should be awarded (if at all) based on seven criteria" contained in ORS 30.925(2)). Neither party asserts that the trial court incorrectly instructed the jury to consider these factors in deciding the amount of punitive damages in this case.

Defendant asserts that "plaintiff's evidence was insufficient to allow the jury to follow these instructions." Plaintiff counters that the record contains some evidence that would have allowed the jury to consider the listed factors. Having reviewed the record presented at the second trial, we agree with plaintiff.

As to the first two factors, the record contains evidence from which the jury could conclude that defendant was aware that serious harm would likely result from its low-tar fraud. Specifically, evidence relating to the links between smoking and disease, compensation in smokers of low-tar cigarettes, and defendant's knowledge of both of those phenomena, combined with evidence regarding defendant's development and marketing of low-tar cigarettes related to those factors. The jury instructions regarding the first jury's verdict in this case and the elements that were conclusively established thereby also relate to the issue of defendant's awareness that serious harm would likely result from its conduct. In particular, defendant had knowingly or recklessly made false representations that low-tar cigarettes were safer and healthier than regular cigarettes and an alternative to quitting smoking and, in making those representations, had intended to mislead Michelle Schwarz. Furthermore, in that conduct, defendant demonstrated a "reckless and outrageous indifference to a highly unreasonable risk of harm." Those conclusions support a determination by the jury that serious harm was likely to result from defendant's conduct and that defendant was aware of that likelihood. With respect to the third factor, in our view, the evidence relating to defendant's marketing efforts and financial condition gave the jury evidence from which it could appropriately determine that defendant's misconduct was profitable. With respect to the fourth factor, the duration of defendant's misconduct and any concealment of it, there was evidence that defendant's misconduct extended over decades, including its continued use of the term "low tar" to describe its cigarettes until 2010. Furthermore, the nature of the misconduct itself—defendant fraudulently represented that low-tar cigarettes delivered less tar and nicotine to the smoker and were, therefore, safer and healthier than regular cigarettes and an alternative to quitting smoking— was pertinent to the jury's consideration of "concealment."

With respect to the fifth factor, the attitude of defendant upon the discovery of the misconduct, we note that, in addition to defendant's continued use of the terms "light" and "low tar" until prohibited by law in 2010, there was evidence from which the jury could conclude that, despite being aware that its low-tar cigarettes were not safer, defendant delayed acknowledging that for decades.

Finally, regarding the sixth factor, as defendant concedes, there was evidence from plaintiff's expert regarding the financial condition of defendant. In sum, we conclude that there was evidence before the jury that allowed it to consider the factors as instructed and its verdict is not "irrational" in light of those factors. We reject defendant's argument to the contrary.

Defendant next contends that, in any event, in light of the compensatory-damage award, the jury's award of $25 million in punitive damages is unconstitutionally excessive. In defendant's view, plaintiff could be awarded no more than "nine times the amount of compensatory damages ($1,516,626)." Defendant further asserts that the award is not necessary for punishment or deterrence.

"Punitive damages awards that are 'grossly excessive' violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, because excessive punitive damages serve no legitimate purpose and constitute arbitrary deprivations of property." *Goddard v. Farmers Ins. Co.*, 344 Or 232, 251, 179 P3d 645 (2008).

> "[W]hen reviewing a punitive damages award for excessiveness, the reviewing court must view the facts in the light most favorable to the jury's verdict if there is evidence in the record to support them. In other words, the reviewing court must resolve all disputes regarding facts and factual inferences in favor of the jury's verdict and then determine, on the facts as the jury was entitled to find them, whether the award violates the legal standard of gross excessiveness."

*Parrott*, 331 Or at 556-57 (internal citations omitted); *see id.* at 555 ("[C]alculating punitive damages is the function of the jury.").

The United States Supreme Court has identified three guideposts that should be considered in determining

whether a jury's punitive damages award comports with due process:

> "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."

*State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 US 408, 418, 123 S Ct 1513, 155 L Ed 2d 585 (2003); *see BMW of North America, Inc. v. Gore*, 517 US 559, 574-75, 116 S Ct 1589, 134 L Ed 2d 809 (1996) (identifying three guideposts for evaluating award of punitive damages). In light of the principles outlined by the Court, we conclude, contrary to defendant's assertion, that the jury's award of punitive damages was not "unconstitutionally excessive."

We begin by addressing the first guidepost, the degree of reprehensibility of defendant's conduct, which the Court has identified as the most "important indicium of the reasonableness of a punitive damages award[.]" *Campbell*, 538 US at 419 (internal quotation marks omitted); *see also Gore*, 517 US at 575 (punitive damages should reflect the enormity of a defendant's offense; "some wrongs are more blameworthy than others"); *Hamlin v. Hampton Lumber Mills, Inc.*, 349 Or 526, 539, 246 P3d 1121 (2011) (acknowledging that the "reprehensibility guidepost" is the most important in determining the reasonableness of an award of punitive damages). Reprehensibility is evaluated

> "by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

*Campbell*, 538 US at 419. According to the Court, "punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.*; *Lithia Medford*

*LM, Inc. v. Yovan,* 254 Or App 307, 322, 295 P3d 642 (2012) ("[T]he United States Supreme Court has recognized that a state like Oregon has a particular interest in deterring and punishing conduct that causes its citizens physical harm, evidences a disregard of their health or safety, or takes advantage of their vulnerability." (Internal quotation marks omitted.)).

Applying those factors in this case, the jury was entitled to conclude that defendant's conduct was extraordinarily reprehensible. First, the harm caused by defendant's conduct was physical, not merely economic. Indeed, the severity of the physical harm was extreme: As a result of defendant's fraud, Michelle Schwarz suffered injury and death. *Cf. Campbell,* 538 US 408 (automobile liability insurer bad-faith failure to settle claims within policy limits); *Gore,* 517 US 559 (automobile distributor failed to disclose that automobile had been repainted after being damaged prior to delivery); *Lithia Medford LM, Inc.,* 254 Or App 307 (auto dealer misrepresented value of a vehicle and then intimidated the purchaser to get the car back). In light of all the facts, this subfactor supported the jury's award of punitive damages.

Likewise, defendant's conduct demonstrated indifference to or reckless disregard for the health or safety of others. Defendant marketed its low-tar brand of cigarettes—a product defendant knew to have deadly health consequences—to convince smokers that there was a reasonable alternative to quitting smoking. As the court instructed the jury, based on the first jury's verdict, when defendant misrepresented low-tar cigarettes to be safer and healthier than regular cigarettes and an alternative to quitting smoking, defendant demonstrated a reckless and outrageous indifference to a highly unreasonable risk of harm and acted with a "conscious indifference to the health, safety and welfare of others."

Furthermore, the conduct at issue was not merely an isolated incident; rather, it was one part of a concerted decades-long effort to deceive smokers and the public about the dangers of smoking, and to keep them smoking by falsely representing low-tar cigarettes to be safer and healthier.

There was evidence that defendant's low-tar representations had been made countless times over many years, and that defendant continued to market cigarettes as "light" or "low tar" until prohibited by law in 2010.

As well, the harm was not a result of mere accident, but was the result of deceit. Defendant made its representations knowing they were false or made them recklessly without knowing whether they were true or false, it intended to mislead Michelle Schwarz, and she died as a result of her reliance on those misrepresentations. In sum, in this case, the jury was entitled to conclude that defendant's conduct was extraordinarily reprehensible in light of the first jury's binding determinations along with the additional evidence presented during the punitive damages trial. *Cf. Williams*, 340 Or at 56 (reprehensibility guidepost favored a significant punitive damage award under the following circumstances: "The harm to Williams was physical—lung cancer cost Williams his life. Philip Morris showed indifference to and reckless disregard for the safety not just of Williams but of countless other Oregonians, when it knowingly spread false or misleading information to keep smokers smoking. Philip Morris's actions were no isolated incident, but a carefully calculated program spanning decades. And Philip Morris's wrongdoing certainly involved trickery and deceit."). Thus, the reprehensibility of defendant's conduct— the most important guidepost—supports the jury's imposition of a very significant punishment.

We turn next to consideration of the difference between the punitive damages awarded by the jury and the applicable penalties authorized or imposed in comparable cases. Although defendant asserts that the third guidepost is "irrelevant here," plaintiff disagrees, and points to the Oregon Supreme Court's discussion of this guidepost in *Williams* in support of that contention. In *Williams*, Jesse Williams's widow and personal representative of his estate brought an action against Philip Morris for, among other things, negligence and fraud, asserting a connection between the decedent's smoking habit and his death. 340 Or at 38. The jury found that Williams's death was caused by smoking, that he continued smoking in significant part because he thought it was safe to do so, and that Philip Morris

knowingly and falsely led him to believe that was the case. With respect to the fraud claim, the plaintiff was awarded both compensatory damages of approximately $821,000 and $79.5 million in punitive damages. In reviewing the punitive damages award to determine if it was unconstitutionally excessive, the court considered the "'comparable sanctions' guidepost." *Id.* at 58. The court observed that evaluation of that guidepost

> "requires three steps. First, courts must identify comparable civil or criminal sanctions. Second, courts must consider how serious the comparable sanctions are, relative to the universe of sanctions that the legislature authorizes to punish inappropriate conduct. Third, courts must then evaluate the punitive damage award in light of the relative severity of the comparable sanctions."

*Id.* According to the court, this guidepost "may militate against a significant punitive damage award if the state's comparable sanctions are mild, trivial, or nonexistent. However, the guidepost will support a more significant punitive damage award when the state's comparable sanctions are severe." *Id.*

Although it noted that courts must exercise care when relying on comparable criminal sanctions in considering this guidepost, the court observed that "the basis for holding that Philip Morris's actions in this case compare to a familiar crime is not speculative or remote." *Id.* at 59. The court explained that,

> "[v]iewing the facts in the light most favorable to plaintiff, Philip Morris's actions, under the criminal statutes in place at the beginning of its scheme in 1954, would have constituted manslaughter. *See* ORS 163.040 (1953). Today, its actions would constitute at least second-degree manslaughter, a Class B felony. *See* ORS 163.125(1)(a). Individuals who commit Class B felonies may face up to 10 years in prison and a fine of up to $250,000. ORS 161.605(2) (term of imprisonment); ORS 161.625(1)(c) (fine). Corporations that commit a felony of any class may be fined up to $50,000, or required to pay up to twice the amount that the corporation gained by committing the offense. ORS 161.655(1)(a) and (3)."

*Id.* at 59-60 (footnotes omitted). In light of those criminal sanctions, "both for any individual who participated and for

the corporation generally," the court concluded that Philip Morris was on notice that "Oregon would take such conduct very seriously." *Id.* at 60. Accordingly, the court concluded that that guidepost supported a "very significant punitive damage award." *Id.*

The same is true in this case. Here, defendant engaged in fraudulent conduct—it made false representations, either recklessly or knowing those representations were false, with the intent to mislead Michelle Schwarz. And those misrepresentations resulted in Michelle Schwarz's death. ORS 163.125 provides:

> "(1)  Criminal homicide constitutes manslaughter in the second degree when:
>
> "(a)  It is committed recklessly;
>
> "* * * * *
>
> "(2)  Manslaughter in the second degree is a Class B felony."[5]

If the conduct is homicide committed "recklessly under circumstances manifesting extreme indifference to the value of human life," it constitutes first-degree manslaughter and is a Class A felony. ORS 163.118. As the court discussed in *Williams*, severe criminal sanctions are applicable to even the lesser of those offenses. *See* ORS 161.605(2) (Class B felony punishable by 10 years imprisonment); ORS 161.625(1)(c) (fine for a Class B felony up to $250,000); ORS 161.655(1)(a) and (3) (corporation may be sentenced to pay a fine up to $50,000 for a felony, or be required to pay up to "double the amount of the corporation's gain from the commission of the offense"). Just as in *Williams*, the severity of the applicable criminal sanctions put defendant on notice that its conduct in this case would be taken seriously, and this guidepost supports the jury's imposition of a significant award of punitive damages.

---

[5] The term "recklessly" is defined in ORS 161.085(9):

"'Recklessly,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

We turn, finally, to the disparity between the actual or potential harm suffered by plaintiff and the punitive damages award. According to defendant, because the ratio of punitive to compensatory damages is 148 to 1, the jury's award of punitive damages is unconstitutional. In defendant's view, an award beyond a single digit ratio is impermissible. Plaintiff, for its part, asserts that, in considering the actual or potential harm in this case, the fact that the "compensatory award did not compensate for the loss of Michelle Schwarz's life" must be taken into consideration. As explained below, we reject defendant's contention that, in light of this guidepost, the punitive damages award is unconstitutional.

Although there is "a presumption against an award that has a 145-to-1 ratio," *Campbell*, 538 US at 426, the United States Supreme Court has consistently rejected the notion that a particular fixed ratio defines the constitutional limit on punitive damages. *Id.* at 425 (declining "to impose a bright-line ratio which a punitive damages award cannot exceed" and noting that "there are no rigid benchmarks that a punitive damages award may not surpass"); *Gore*, 517 US at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula[.]"); *Hamlin*, 349 Or at 533 (United States Supreme Court's "repeated refusal to set any 'rigid benchmark' beyond which a punitive damages award becomes unconstitutional" is key to a proper understanding of the second guidepost). "[B]ecause there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those [the courts] have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *Campbell*, 538 US at 425 (quoting *Gore*, 517 US at 582)). On the other hand, when "compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*

The amount that may be awarded depends on "the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* Thus, in *Campbell*, a bad-faith insurance case where the jury had awarded $1 million in compensatory damages and $145 million in punitive

damages, the Court observed that the compensatory damages of "$1 million for a year and a half of emotional distress," were "complete compensation." *Id.* at 426. The Court also noted that much of the distress suffered by the plaintiffs "was caused by the outrage and humiliation [that they] suffered at the actions of their insurer; and it is a major role of punitive damages to condemn such conduct. Compensatory damages, however, already contain this punitive element." *Id.*; *see Williams*, 340 Or at 49 (in *Campbell*, the plaintiffs had "received a substantial compensatory damages award; they were injured economically, not physically; and [the insurer] paid the excess verdict before [the plaintiffs] sued them, so their economic injuries were minor. Additionally, the outrage and humiliation that [the insurer] caused [the plaintiffs] may have been considered twice—once in the compensatory damage award and again in the punitive damage award." (Internal citation omitted.)).

Here, several considerations play into our assessment of this guidepost. First, as plaintiff points out, and in contrast to *Campbell*, the compensatory damages awarded here did not constitute "complete compensation" for the harm caused by defendant's conduct. As a result of defendant's conduct, Michelle Schwarz suffered injury and death. But, as the trial court instructed the jury in this case, the $168,514.22 in compensatory damages awarded to plaintiff accounted for "Mrs. Schwarz's medical and funeral expenses, her disability and pain and suffering; and her spouse's and children's loss of her society, companionship and services." However, those damages did *not* account for the loss of her life itself, as "Oregon law does not provide for compensatory damages for loss of life to the person who has died or to her estate in this type of case." Thus, the compensatory damages did not account for all of the harm directly suffered as a result of the actions of defendant. Rather, defendant's conduct caused harm for which defendant was not required to pay.

Furthermore, in our view, less than $170,000 is a relatively small amount for the death of a human being and would not serve an appropriate admonitory function in the circumstances of this case. As noted above, defendant engaged in particularly egregious acts in this case, but that

conduct resulted in a relatively small amount of compensatory damages in light of the harm that resulted. *See Hamlin,* 349 Or at 534-35 (courts have flexibility when it comes to applying ratios where a highly reprehensible act results in a small damages award). For that reason, we view this as a case where a greater than usual ratio would be appropriate. *See Lithia Medford LM, Inc.,* 254 Or App at 307 (approving a punitive damages award with a ratio of 200 to 1 where the defendant's conduct was reprehensible and the compensatory damages were small).

Finally, as the Supreme Court explained in *Williams,* "the absence of bright-line rules necessarily suggests that the two other guideposts—reprehensibility and comparable sanctions—can provide a basis for overriding the concern that may arise from a double-digit ratio." 340 Or at 63. In other words, in a case where the defendant's conduct is extreme, a higher ratio may comport with due process. Thus, in *Williams,* the court explained:

> "And this is by no means an ordinary case. Philip Morris's conduct here was extraordinarily reprehensible, by any measure of which we are aware. It put a significant number of victims at profound risk for an extended period of time. The State of Oregon treats such conduct as grounds for a severe criminal sanction, but even that did not dissuade Philip Morris from pursuing its scheme.
>
> "In summary, Philip Morris, with others, engaged in a massive, continuous, near-half-century scheme to defraud the plaintiff and many others, even when Philip Morris always had reason to suspect—and for two or more decades absolutely knew—that the scheme was damaging the health of a very large group of Oregonians—the smoking public—and was killing a number of that group. Under such extreme and outrageous circumstances, we conclude that the jury's $79.5 million punitive damage award against Philip Morris comported with due process, as we understand that standard to relate to punitive damage awards."

*Id.* at 63-64.

Here, likewise, Philip Morris engaged in extraordinarily reprehensible conduct. Its conduct was a continuation of its decades-long scheme to defraud plaintiff and others and keep them smoking cigarettes, although it knew of the

health consequences. In order to give smokers a psychological crutch, it misrepresented the nature of its low-tar cigarettes, conveying the message that they were safer and healthier than regular cigarettes when, in fact, they were not. As the first jury found, defendant acted with a conscious indifference to the health, safety, and welfare of others, and its conduct demonstrated a reckless and outrageous indifference to a highly unreasonable risk of harm. Under the circumstances of this case, like in *Williams*, given the reprehensibility of defendant's conduct, contrary to defendant's contention, the ratio of punitive damages to compensatory damages does not compel a conclusion that the award of punitive damages violates due process.

Finally, we note that the court in *Williams* approved a far larger punitive damages award—$79.5 million—for similar conduct. Furthermore, the jury was instructed to consider, "in view of the defendant's financial condition, what amount [would be] necessary to punish it and discourage future wrongful conduct." Given the extreme reprehensibility of defendant's conduct, taken together with the evidence of defendant's financial resources and the intended punishment and deterrent function of the award, although $25 million is a serious sanction, the jury could properly conclude that such an award was appropriate.

In sum, we conclude that the jury's award of punitive damages was not arbitrary or unconstitutionally excessive. Accordingly, the trial court did not err in denying defendant's motion to reduce the punitive damages award.

Affirmed.